UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA　　　:　　　Case No. 3:13-cr-00128 (AWT)
　　　　　　　　　　　　　　　　　　　:
　　　　　　　v.　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
PETER PICONE　　　　　　　　　　:　　　May 14, 2015

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The government respectfully submits this memorandum in connection with the scheduled

sentencing of defendant Peter Picone ("Picone") on June 9, 2015.  The government opposes

Picone's request for a non-incarceratory sentence based primarily on "Diminished Capacity," as

that term is defined in Section 5K2.13 of the United States Sentencing Guidelines (the

"Guidelines").  *See* Defendant's Memorandum in Aid of Sentencing, dated April 30, 2015 ("Def.

Mem."), at 1.  The government urges the Court instead to impose an incarceratory sentence

within the applicable advisory Guidelines range of imprisonment of 37 to 46 months, to which

the parties stipulated in their plea agreement executed in conjunction with Picone's June 3, 2014

guilty plea.  See Peter Picone Plea Agreement, dated June 3, 2014 ("Plea Agreement"), at 7.  In

addition, the government asks the Court to order the agreed to forfeiture of both contraband,

namely, 12,960 integrated circuits ("IC"s) bearing counterfeit trademarks, and criminal proceeds,

in the form of a $70,050.00 money judgment.  Finally, the government requests that the Court

order restitution in the amount of $2,360,622.80 to thirty-one identified victims of Picone's

conduct.

## I.    Procedural History

Picone was arrested on July 17, 2013, following the return of an eight-count indictment (the "Indictment") charging him with conspiracy to traffic in counterfeit goods and the substantive crime of trafficking in counterfeit goods, conspiracy to traffic in counterfeit military goods, wire fraud and wire fraud conspiracy, and conspiracy to commit international money laundering.  On June 3, 2014, pursuant to the Plea Agreement, Picone pled guilty to Count Two of the Indictment, charging him with conspiracy to traffic in counterfeit military goods. Although the time period charged in that count was only January 2012 through April 2012, because the statutory provision specific to military goods was only enacted on December 31, 2011, Picone stipulated that his criminal conduct actually spanned from at least February 2007 through April 2012.  *See* Plea Agreement at 13.

## II.    The Sentencing Guidelines

The parties stipulated to a total offense level ("TOL") under the Guidelines of 21, assuming Picone fell in Criminal History Category I, with a resulting advisory range of imprisonment of 37-46 months.  *See* Plea Agreement at 7.  That TOL is based primarily on an infringement amount of $352,076, *see* U.S.S.G. §§ 2B5.3(b)(1)(B), 2B1.1(b)(1)(G), which was calculated by adding up the total value of the ICs bearing counterfeit marks which were: (i) imported by Picone but seized by Customs and Border Protection ("CBP") ($65,867);[1] (ii) sold by Picone to a customer who tested them and discovered they were not genuine ($68,000);[2] (iii) sold by Picone to federal agents acting in an undercover capacity ($2,050);[3] and

---

[1]    This is the total "domestic value" of the infringing ICs from CBP seizures, which CBP determines by adding the cost of manufacturing goods in a foreign country to the costs of shipping, insurance and customs duties to enter the United States, so it is lower than the total manufacturer's suggested retail prices (MSRP) of $192,700.

[2]    This is the price Picone charged.

[3]    This is the price Picone charged.

(iv) seized during the execution of a search warrant at Picone's office and residence in Methuen, Massachusetts on April 24, 2012 ($216,159).[4]  *See* Plea Agreement at 14-15.  The TOL also incorporates two-level enhancements for importation of infringing items, *see* U.S.S.G. § 2B5.3(b)(3)(A), and Picone's role in the offense as an organizer, leader, manager, or supervisor of criminal activity.  *See* U.S.S.G. § 3B1.1(c).  Finally, the TOL recognizes Picone's early acceptance of responsibility, which relieved the government of the time and expense of a trial, with a three-level reduction.  *See* U.S.S.G. § 3E1.1.

### A.    Diminished Capacity

Picone, although stipulating to an advisory range of imprisonment of 37-46 months, argues for a downward departure based upon "Diminished Capacity."  U.S.S.G. § 5K2.13.  Picone specifically reserved the right to do so.  *See* Plea Agreement at 7.  The government opposes such a departure because there is no evidence, other than Picone's own self-serving statements, that his struggles with anxiety and depression, and his consequent long-term use of prescription anti-depressants and anti-anxiety drugs, contributed substantially to his commission of the instant offense.

The relevant Guidelines provision, termed [only] a "Policy Statement" by the United States Sentencing Commission (the "Commission"), provides in relevant part:

> A downward departure *may* be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; *and* (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. [Emphasis added.]

U.S.S.G. § 5K2.13.  Notably, the departure applies only if the reduction in mental capacity actually contributed to the offense.  By way of explanation, the Commission adds:

---

[4]    This is based on MSRP, which the investigators, in the absence of the CBP appraisal performed on goods seized at the border, determined by checking the victim companies' websites and other trade publications.

> "[s]ignificantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong.

*Id.* cmt. n.1

Picone, in an attachment to his sentencing memorandum, *see* Def. Mem. Exhibit 1, provided the Court with fifty-four pages of medical records documenting, among other things, his repeated complaints to physicians of anxiety, depression and panic attacks. The physicians prescribed Picone anti-depressants and anti-anxiety medications including Effexor, Xanax and Klonopin. His dosages of these drugs varied in response to his complaints and because he made several efforts to reduce his dependence on the drugs. The government does not question the severity of Picone's maladies, which appear to be long term, serious, and corroborated repeatedly by his physicians upon examination.

Picone, however, has not demonstrated either that his conditions constitute a "significantly reduced mental capacity," as the Commission has defined it, or, even assuming that they do, that they caused him to commit the instant offense.

First, Picone clearly understood the wrongfulness of his behavior, because he took extensive efforts to conceal it. For example, he has stipulated that in both of his sales to federal undercover agents, he included test reports purporting to document the authenticity of ICs which he knew were destined for nuclear submarines deployed by the United States Navy – not only did those reports document no such thing, but Picone signed them with the name of a fictional testing operator. *See* Plea Agreement at 14. During the second sale, to a buyer purchasing the ICs for supply "to the Navy on a contract they have for a new submarine," *id.*, Picone even underscored the fraud in a January 27, 2012 email to the buyer, writing:

> Though there is no complete guarantee, we come pretty close with
> testing and internal trace routing.  We take the best steps possible
> to avoid junk getting into the market, especially military.

In addition, the chief reason Picone switched from one corporate entity to another, Tytronix to Epic, was because CBP seizures of Tytronix imports had started to mount, so Picone sought to avoid scrutiny at the border by using a new company without the bad history.

Second, it is wholly unclear to the government how Picone's condition impeded his ability to control the specific behavior constituting this particular offense, which he clearly knew was wrongful.  To the contrary, it is extraordinary how much Picone accomplished despite suffering from anxiety and depression.  This was not a one-off event.  This was not a crime of passion.  This was not a crime committed, or which he *could* have committed, while in a stupor.  This was a sophisticated criminal enterprise which required Picone's sustained and almost total focus.  Picone, with a ninth-grade education, was purchasing highly intricate electronic components from dozens of suppliers half way around the world, importing them to the United States, negotiating Customs regulations, stocking his inventory with ICs bearing the counterfeit trademarks of over thirty different manufacturers, preparing [fake] testing reports, marketing and selling the ICs to a broad range of sophisticated and technically savvy buyers, including some (in addition to the undercover agents) purchasing for supply to the United States Navy, all the while running a multi-employee business and cycling through two corporate entities.  This was an impressive operation, albeit in the service of bad.

Moreover, Picone's ability to control wrongful behavior, despite his maladies, is evident in other aspects of his life as well.  By all appearances, he is an exemplary husband and father. He was honorably discharged from the United States Army after meritorious service in a combat unit.  Despite little formal education, he has persevered and made himself a technical expert with

extensive knowledge of computers and complex electronic components.  He has *no criminal record*.

Ultimately, the government is not asking the Court to ignore Picone's struggles with anxiety and depression.  Part of the Court's analysis will of course include consideration of Picone's "history and characteristics."  18 U.S.C. § 3553(a)(1).  That is appropriate.  The government urges the Court, however, not to accept the premise that Picone committed the instant offense in large part *because* of his anxiety and depression, when there is simply no evidence in the record, including the materials Picone submitted for sentencing, of such a causal link.

**B.      Conscious or Reckless Risk of Death or Serious Bodily Injury**

The United States Probation Department ("Probation"), in its revised Presentence Report ("PSR"), recommended a two-level enhancement to the TOL because it found, pursuant to U.S.S.G. § 2B5.3(b)(5)(A),[5] that the offense "involved … the conscious or reckless risk of death or serious bodily injury …."  PSR ¶ 35.  The government asks the Court not to impose this enhancement, to which the parties did not stipulate.  *See* Plea Agreement at 7.

The government suggests that while the enhancement is not inappropriate – it was reasonable for Probation to find that malfunctioning ICs which "failed during critical applications," *id.*, posed such a risk – the defendant's plea to the specific crime of conspiring to traffic in counterfeit *military* goods requires the Court to parse this closely.  That statute provides that the defendant must have trafficked in counterfeit military goods knowing that their use, malfunction or failure was "likely to cause serious bodily injury or death [or] the disclosure of classified information [or] impairment of combat operations, or other significant harm to a

---

[5]      As Probation notes, the November 1, 2012 Guidelines Manual controls, but in the current Guidelines Manual, this provision has been renumbered U.S.S.G. § 2B5.3(b)(6)(A).

combat operation, a member of the Armed Forces, or to national security …." 18 U.S.C. § 2320(a)(3). While it is true that Count Two, to which Picone pled guilty in full satisfaction of the Indictment, pleads these potential risks in the conjunctive, the parties "Stipulation of Offense Conduct" specifically referred to "impairment of combat operations and other significant harm to national security." Plea Agreement at 14. The government raises this not to minimize the seriousness of the defendant's conduct, but rather to emphasize that Congress considered trafficking in counterfeit military goods a unique and especially serious crime, one carrying enhanced prison exposure and fines, if the defendant knew that it was likely to cause *any* of the harms enumerated in the statute, not solely serious bodily injury or death.

Notably, the Commission has since added to the Guidelines a wholly separate provision relating to the counterfeit military goods violation, which permits a two-level enhancement if the "use, malfunction, or failure [of a counterfeit military good] is likely to cause … impairment of combat operations … or … other significant harm to ... national security …", with the implication that this applies even it is not likely to cause serious bodily injury or death. U.S.S.G. 2B5.3(b)(7)(ii) (November 1, 2014). This provision was not effective till November 1, 2013, and thus the government did not include it in the stipulated Guidelines range set out in the Plea Agreement. The government suggests, however, that the provision can still inform the Court at sentencing, and without disturbing the advisory Guidelines range agreed to by the parties. *See, e.g., United States v. Mateos*, 623 F.3d 1350 (11th Cir. 2010) (Justice O'Connor, sitting by designation, holding that forthcoming changes to the sentencing guidelines inform both the sentencing and reviewing courts on the appropriate sentencing in a given case). The government suggests that consideration by the Court of this pending Guidelines provision, created

7

specifically for the counterfeit military goods violation, is the most appropriate way of considering the potential harm from counterfeit ICs failing during critical applications.

### III.    Restitution

The government submits that the Court should order restitution in the amount of $2,360,322.80 to thirty-one identified direct victims of Picone's criminal conduct – those companies whose trademarks were counterfeited on the ICs which Picone imported from China and sold to unsuspecting customers in the United States.  Attachment A to this memorandum is a schedule which lists each of the victims and their restitution amounts, totaling $2,360.322.80. The government based the restitution amounts for each victim on the total value of: (i) seizures of counterfeit ICs by CBP; (ii) seizures of counterfeit ICs during the execution of search warrants at the defendant's residence and business on April 24, 2012; and (iii) sales of counterfeit ICs reflected in the defendant's sales records seized during the April 24 search.  In the government's view, all of these represent lost sales for the victims – either because Picone did not buy his ICs from them, or because Picone sold to their presumptive customers – a standard measure of restitution in trademark counterfeiting cases.  *See United States v. Milstein*, 481 F.3d 132, 136-37 (2d Cir. 2007) (finding, in criminal trademark prosecution, that restitution should be based on the rights holders' "lost sales," as provided in the civil trademark provisions of the Lanham Act, 15 U.S.C. § 1117(a)(1)-(2)).

The government is cognizant that the defendant has twice filed for bankruptcy, most recently in 2014.  Consequently, there is little chance he will ever be able to satisfy any significant portion of a $2.3 million restitution order, should the Court adopt the government's figures.  Nevertheless, because restitution is mandatory for trademark counterfeiting offenses, *see* 18 U.S.C. § 2323(b), the government wants the Court to have the most accurate loss

information possible.  The government is not aware of any statutory provision which permits the Court to forgo mandatory restitution because of a defendant's inability to pay – in contrast, for instance, to the decision to impose a fine as part of the sentence.  This recognizes that the primary purpose of restitution is to recognize the victims' losses, not to punish the defendant or disgorge his gains.

Finally, the gap between the infringement amount, $352,076, to which the parties stipulated for Guidelines purposes, and the ~ $2.3 million restitution amount proposed by the government, results from the government's inclusion in the restitution amount of Picone's *sales* of ICs which were very likely counterfeit.  The government was content to leave those sales out of the stipulated Guidelines calculation because it did not have the ICs in hand (in contrast to those seized by CBP and during execution of the search warrant at Picone's residence, as well as those purchased by undercover federal agents), and thus was not in a position to test them for authenticity.

That said, the government, after reviewing and organizing thousands of Picone's invoices seized during the search of his residence, both those from his suppliers and those for his own customers, identified all the instances in which a customer, *in writing*, specifically requested ICs which were neither refurbished nor from *China*, and Picone surreptitiously supplied them with just that – refurbished ICs imported from China.  As Picone [and his customers] well knew, the ICs he imported from China were almost certainly counterfeit.  This has been well documented, including recently by the Senate Armed Services Committee:

> [D]efense contractors and electronic part distributors all identified China as the primary source of counterfeit electronic components. The Committee's findings support their assessment …. [T]he Committee tracked well over 100 specific instances of suspect counterfeit electronic parts backward through the supply chain. More than 70 percent of the suspect parts were traced back to China.

S. Rep. No. 112-767, at 4-5 (2012). Consistent with this, investigators identified approximately 70% of Picone's inventory of ICs as counterfeit when they searched his residence and office. If anything, the $2.3 million figure probably understates the victims' lost sales – during the period of Picone's scheme, approximately February 2007 through December 2012, the invoices reflect total sales of $4,122,000, and assuming 70% of those were counterfeit, the restitution owed to the victim companies should be $2,885,000.

Picone contends that the Court should order restitution of $352,076, consistent with the infringement amount used for the Guidelines calculation. Def. Mem. at 3. The government believes that using this figure – based solely on the counterfeit ICs *seized*, while omitting completely the millions of dollars worth of ICs Picone actually *sold* which in all likelihood were also counterfeit – fails to compensate the victims adequately for their lost sales. Should the Court go with this lower figure, however, the government can provide a breakdown by victim of the amounts owed.

**IV.    The 3553(a) Factors**

The Court is well aware of the factors it must consider in sentencing Picone, which are

set out at 18 U.S.C. § 3553(a), and thus, in lieu of enumerating them all, the government will

focus on those it considers most critical in this case.

**A.    Seriousness of the Offense**

This was a very, very serious offense, which the Court is bound to consider during its

analysis.  *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).  Picone knowingly sold counterfeit ICs to

the United States Navy for use in a nuclear submarine.  The consequences could have been

catastrophic.  The Senate Armed Services Committee outlined some of the dangers:

> Counterfeit electronic parts pose a significant risk to the
> performance of defense systems.  Even if counterfeits made from
> previously used parts and salvaged from e-waste may initially
> perform, there is no way to predict how well they will perform,
> how long they will last, and the full impact of failure.  As
> Samsung, a major semiconductor manufacturer, put it,
> "[s]emiconductor components have limited useful lives." [Footnote
> omitted.]  Xilinx, another semiconductor manufacturer [and one of
> Picone's victims], described the risks of using parts salvaged from
> e-waste:
>
>> The devices may have been reclaimed and potentially
>> exposed to excessive heat in order to dismount them from a
>> circuit board.  These cases pose a significant reliability risk
>> owing to the potential exposure to excessive heat and
>> electro-static discharge (ESD) damage … With respect to
>> ESD, there are many potential damage mechanisms that
>> could have affected the devices.  Some of these could be
>> *catastrophic*; others may create a damage mechanism that
>> is latent for an undetermined amount of time ….  Though
>> the devices may initially function, it would be next to
>> impossible to predict what amount of life is remaining, or
>> what damage may have been caused to the circuitry.
>> [Footnote omitted.]
>
> A second danger associated with counterfeit electronic parts has to
> do with how they are marked.  The marking on an electronic part
> includes information that allows a buyer to determine its

11

performance grade.  Knowing a part's performance grade is critical as military grade parts, for example, are certified to operate over a broader temperature range than industrial or commercial grade parts.  As a result, military grade parts may be used when a device is expected to be exposed to extreme conditions, such as in defense applications.  Counterfeiters, however, often remove the original manufacturer's marking on a part and remark it with an entirely different part number.  So, while a part may be of commercial grade it could be remarked as military grade.  Such remarked parts may pass basic testing but fail in the field when they are exposed to extreme temperatures and other conditions.  [Footnote omitted.]

The President of the Semiconductor Industry Association likened using counterfeit parts to "playing Russian roulette," explaining, "[w]ith luck, the chip will not function at all and will be discovered in testing.  But in some cases the chip may work for a while, but because of the environmental abuse it could fail at a *critical* time – when the product containing the chip is stressed – as in *combat*." [Footnote omitted.]

Contractors conduct acceptance testing of defense systems where the systems may be subjected to heat, vibration and other stresses. However, such testing may not weed out all counterfeit parts. According to General Patrick O'Reilly, the Director of the Missile Defense Agency (MDA) [footnote omitted]:

> A counterfeit part may pass all production testing. However, it is possible that the part was damaged during unauthorized processing (e.g., removing the part from a previous assembly, or sanding the surface in order to place a new part number) causing the deployed system to fail. Similarly, reliability may be affected because a counterfeit part may be near the end of its useful life when it is installed.  Should any mission critical component fail, that system fails and *national security is impacted.*  [Footnote omitted.]

S. Rep. No. 112-167, at 7-8 (2012) [emphasis added].

In addition, the government intends to call as a witness at Picone's sentencing hearing Rear Admiral Michael Jabaley of the United States Navy, who was Program Manager for the Navy's VIRGINIA Class nuclear submarines during the period of Picone's criminal conduct, to describe in greater detail the consequences of installing counterfeit ICs on a nuclear submarine.

12

### B.      Deterrence

The Court is also bound to consider the impact which Picone's sentence will have on other individuals considering similar offenses.  *See* 18 U.S.C. § 3553(a)(2)(B).  Once final, Picone's conviction will be just the second ever under the new counterfeit military goods provision which Congress enacted as part of the National Defense Authorization Act of 2011. That provision *doubled* the statutory maximum period of imprisonment applicable to non-military counterfeits, from ten to twenty years, and *more than doubled* the maximum fine applicable to non-military counterfeits, from $2,000,000 to $5,000,000.  Clearly, Congress considered this a pressing problem.  In this case, the government agreed to stipulate to an advisory Guidelines range of imprisonment which puts Picone nowhere near that statutory maximum.  If the Court, however, were to depart downward from this already moderate range, much less impose a non-incarceratory sentence, this would send the wrong signal to other potential offenders and frustrate the intent of Congress.

## V.      Counterfeit ICs in the Stream of Commerce

As set out above, Picone sold over $4 million worth of ICs, and the government believes, at a minimum, that the $2 million worth of ICs he sold while fraudulently concealing their Chinese origin were probably counterfeit.  The government is concerned that thousands of those ICs may either already be installed on critical equipment, including military, or warehoused as spares or replacement parts.  Although the government issued a non-public list of the counterfeited brands and part numbers to government agencies during the pendency of the investigation, the government held off on a broader public notification because it could have compromised the investigation or alerted potential co-conspirators.  At this point, however, in the interest of public safety, the government has set out in Attachment B a list of all of Picone's sales

13

of ICs whose Chinese origin he concealed.  This should allow both Picone's customers, and, in turn, any of *their* customers, to check their inventories for counterfeit ICs.

## VI.    Conclusion

For the reasons stated above, the government urges the Court to impose a sentence within the advisory Guidelines range of 37 to 46 months agreed to by the parties, forfeiture of contraband and criminal proceeds – the 12,960 counterfeit ICs seized from Picone's inventory and the $70,050 paid to Picone by a third-party customer and to federal undercover agents for ICs which were actually tested and confirmed counterfeit – and restitution in the amount of $2,360,622.80 to thirty-one identified victims of Picone's conduct.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY


/S/
CAROL SIPPERLY
SPECIAL ASSISTANT
  UNITED STATES ATTORNEY
UNITED STATES ATTORNEY'S OFFICE
157 CHURCH STREET; 23RD FLOOR
NEW HAVEN, CT  06510
(203) 821-3700


/S/
EVAN WILLIAMS
SENIOR COUNSEL
COMPUTER CRIME &
  INTELLECTUAL PROPERTY SECTION
UNITED STATES DEPARTMENT OF JUSTICE
1301 NEW YORK AVENUE, N.W., STE. 600
WASHINGTON, D.C.  20530
(202) 307-0135

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF.

/S/
EVAN WILLIAMS
SENIOR COUNSEL
COMPUTER CRIME &
  INTELLECTUAL PROPERTY SECTION
UNITED STATES DEPARTMENT OF JUSTICE

16