UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          3:13CR00128(AWT)

          vs.

PETER PICONE

                              HARTFORD, CONNECTICUT
          Defendant          AUGUST 14, 2015

- - - - - - - - - - - - - - - x

**SENTENCING HEARING**


          BEFORE:


                HON. ALVIN W. THOMPSON, U.S.D.J.


APPEARANCES:


     FOR THE GOVERNMENT:

          U. S. DEPARTMENT OF JUSTICE
          Computer Crime & Intellectual Property
          1301 New York Avenue  Ste. 600
          Washington, DC  20005
          BY:  EVAN CHARLES WILLIAMS, ESQ.
               KENDRA ERVIN, ESQ.

     FOR THE DEFENDANT:

          JEFFREY DENNER ASSOCATES
          Four Longfellow Place
          Boston, Massachusetts  02114
          BY:  JEFFREY A. DENNER, ESQ.


                         Corinna F. Thompson, RPR
                         Official Court Reporter

# TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| REAR ADMIRAL MICHAEL JABALEY | | | | |
| BY MR. WILLIAMS: | 13 | | | |
| BY MR. DENNER: | | 38 | | |

1

2                          **10:49 AM**

3              THE COURT:  Good morning.  Please be seated

4      everyone.

5              We're here for sentencing proceedings in the

6      matter of United States of America versus Peter Picone.

7      The docket number is 3:13CR128.

8              Would counsel please state their appearances

9      for the record and identify anyone seated at counsel

10     table with you.

11             MR. WILLIAMS:  Good morning, Your Honor.

12     Senior counsel Evan Williams and Kendra Ervin with the

13     Computer Crime and Intellectual Property section of the

14     Department of Justice in Washington, along with

15     assistant United States Attorney Deborah Slater from the

16     U.S. Attorney's Office in the district of Connecticut.

17     Also seated at counsel table is Special Agent Jessica

18     Harrington with the Defense Criminal Investigative

19     Service and I can either introduce now or at a later

20     time the government's proposed witness.

21             THE COURT:  Thank you.

22             Mr. Denner?

23             MR. DENNER:  Good morning, sir.  Jeffrey

24     Denner the attorney for the defendant who's seated next

25     to me, Peter Picone.

4

1              THE COURT:  Thank you.

2              The record should also reflect that United

3       States Probation Officer Chester is present.  She's

4       seated in the jury box.  She's covering for United

5       States Probation Officer Aponte, the author of the

6       Presentence Report.  He's out on leave at this time.

7              On June 3, 2014, the defendant, Mr. Picone,

8       entered a plea of guilty to Count 2 of the indictment

9       which charges the defendant with conspiracy to traffic

10      counterfeit military goods in violation of

11      Section 2320(a) and (b)(3)(A) of Title 18 of the United

12      States Code.  The Court accepted the plea of guilty and

13      thereupon entered a finding of guilty.

14             A Presentence Report was prepared for the

15      Court by the United States Probation Office.  I have

16      reviewed that report and the addenda thereto in

17      consultation with both Probation Officer Aponte and

18      Probation Officer Chester.

19             Mr. Williams, is the government making a

20      motion pursuant to Guideline Section 3E1.1(b) for the

21      third point for acceptance of responsibility?

22             MR. WILLIAMS:  Yes, Your Honor.

23             THE COURT:  The motion is granted.

24             I sent word there were a couple of points I

25      wanted to discuss with counsel regarding restitution and

1    the consent order.  So I don't forget, at what point did

2    you want to have your witness testify, Mr. Williams?

3              MR. WILLIAMS:  Your Honor, the government,

4    unless there's any objection from the defense, would

5    prefer to have him testify as early as possible in the

6    proceedings so that, unless the Court or counsel has

7    further questions for him, he could be excused after

8    that.  Obviously, he has the nation's business to do.

9              MR. DENNER:  I would never get in the way of

10   nation's business, Your Honor.

11             THE COURT:  Let's talk about these two issues

12   and then we'll take the witness.

13             MR. WILLIAMS:  Thank you, Your Honor.

14             THE COURT:  I guess in terms of the

15   government's number for restitution, I assume that that

16   is the Attachment B to the government's sentencing

17   memorandum, the list of losses and --

18             MR. WILLIAMS:  It is actually, I believe,

19   Attachment A, Your Honor.  Those are the proposed

20   restitution amounts.

21             THE COURT:  And what is B then?  Is B a

22   breakout for purchase orders or --

23             MR. WILLIAMS:  Attachment B, Your Honor, is a

24   breakout of all of the sales which the government

25   believes may have been of counterfeit parts.  Obviously,

1    the government doesn't have those in hand, but because

2    at least some of these parts may have gone to the

3    military, there was some concern that over the course of

4    the defendant's business operations some of them may

5    have gotten into the stream of commerce, gotten into the

6    supply chain.  And so once the government's

7    investigation was public and the plea was complete, as

8    we explained in the sentencing memorandum, we felt it

9    was prudent to publish publicly with the sentencing

10   memorandum a list of all the sales including the

11   companies to whom the suspect parts were sold and the

12   original equipment manufacturers whose parts they were

13   purported to be.  Basically just so that all those

14   companies could check their inventories and make sure

15   that they didn't have any substandard or counterfeit

16   parts.

17           THE COURT:  Let me ask about Exhibit A then.

18   What are the dates for the sales in Exhibit A?  I was

19   looking for a time frame for the sales.

20           MR. WILLIAMS:  They are, in fact, as Your

21   Honor actually correctly recognizes, Attachment B is

22   basically a breakout of all the individual sales.  So

23   more or less they span the period which is charged in

24   the indictment, which is more or less 2007 through 2011.

25           THE COURT:  Okay.  Let me share with you my

```
1   concern.  I believe the defendant pled to Count 2 of the
2   indictment, and Count 2 of the indictment charges a
3   conspiracy from in or about January 2012 through in or
4   about April 2012.  It's one thing if we're determining
5   relevant conduct, but I think restitution is another
6   analysis.  My impression has always been that if the
7   conspiracy that's charged is January 2012 to April 2012,
8   the restitution that could be ordered would be for the
9   conduct that occurred -- whether it's sales or thefts or
10  whatever -- during that period of time, absent an
11  agreement by the defendant to make restitution for some
12  broader period of time.
13          So do we have a -- that's my understanding.
14  If the government has a different understanding, I'd
15  listen.
16          MR. WILLIAMS:  No.  I think the Court's
17  analysis is correct.  Basically by way of explanation,
18  I'm not sure that it actually changes the Court's
19  analysis, but just by way of explanation -- and this is
20  all something that we've explained in the sentencing
21  memorandum -- while the plea was to Count 2 which
22  charges a very discrete period of time because that
23  particular statute was only enacted on December 31$^{st}$ of
24  2011, the defendant did allocute to conduct from 2007 to
25  2012.  So that was the basis for the government's
```

1    proposal that restitution should cover the entire period

2    to which he admitted committing criminal conduct.

3              But the government can't dispute what the

4    Court is saying, that the charge on conviction, Count 2,

5    does cover only that brief period, basically because the

6    statute was only enacted in 2011.

7              THE COURT:  And I do, however, see in the

8    defendant's papers a statement that the defendant

9    believes the amount of the restitution should be -- let

10   me get that number -- $352,076.

11             What's that figure tied to, Mr. Denner?

12             MR. DENNER:  That's tied to the stipulated

13   infringement amount that would have occurred in that

14   two- to three-month period.

15             THE COURT:  Do I take it that's also then the

16   stipulated restitution amount?

17             MR. DENNER:  It wasn't a stipulated

18   restitution amount.

19             THE COURT:  It was or was not?

20             MR. DENNER:  Was not.  If I'm recalling, we

21   didn't stipulate to a restitution amount.  I believe

22   that probation or pretrial services came up with the

23   number, probation came up with the number of the

24   $2 million plus, and in our objection to the Presentence

25   Report we objected to that, as well as saying it should

1    simply be -- for two reasons it should be that lesser

2    number.  Number one, the dates of the conspiracy that we

3    pled to, and secondly, that number is based also on ICs

4    that were seized pursuant to a search warrant or

5    intercepted at different places coming into the country

6    or leaving the country.

7            Respectfully, the other stuff is speculation.

8    It's speculation that every other bit of his gross for a

9    certain period of time, gross derived from the sale of

10   all of his inventory, were counterfeit parts.  There's

11   no proof of that.  That's just pure speculation.

12           THE COURT:  So what's your position as to what

13   the proper amount for restitution is?

14           MR. DENNER:  $352,000.76 (sic).

15           THE COURT:  $352,076.

16           MR. DENNER:  Yes.

17           THE COURT:  Sounds like we have a number then.

18           MR. WILLIAMS:  Thank you, Your Honor.

19           THE COURT:  And I think the government's

20   memorandum mentioned that if we came to that number, the

21   government would be able to get me a list of victims and

22   I will need a mailing address for each victim.

23           MR. WILLIAMS:  Yes, Your Honor.  Is that

24   something that we can e-mail to the Court following the

25   proceeding?

1              THE COURT:  Yes.

2              And then the other question that I had related

3       to the consent order.  I believe that I got a document

4       that's called an amended consent order of forfeiture, a

5       draft of one at least.

6              MR. WILLIAMS:  Yes, Your Honor.  Actually,

7       it's been amended again since then with some handwritten

8       corrections.  So I have -- and I can either hand it up

9       at this time or later -- I have a copy which has been

10      signed by the parties.  We handwrote one correction

11      which it's a figure which appears three times in the

12      document.  So we've corrected it all three times.

13             THE COURT:  What is that figure?

14             MR. WILLIAMS:  That is the figure of

15      integrated circuits, basically the contraband figure,

16      the integrated circuits that were seized from the

17      defendant's home and business.  The government realizes

18      now -- and we informed counsel of this prior to the

19      proceeding -- it doesn't change the dollar amount but

20      the number of integrated circuits was actually 35,870,

21      not 12,960.

22             THE COURT:  I guess what wasn't clear to me

23      when I read this was it says the following property is

24      declared forfeited to the United States, and then we

25      have the 35,870 integrated circuits, and then

1    Paragraph B is a judgment.  Conceptually, I just didn't

2    relate to having a judgment forfeited to the United

3    States.

4             Are we talking about -- is that the value of

5    the circuits?

6             MR. WILLIAMS:  No, Your Honor.  That's

7    separate.  In other words, the circuits are contraband

8    so pursuant to Title 18 U.S.C. 2323, those must be

9    forfeited as a part of any judgment of conviction.  But

10   in addition, the defendant agreed to forfeit a sum of

11   money equal to $70,050, which basically represents

12   sales, knowing sales of counterfeit goods, both to

13   undercover agents operating for the government and also

14   in one case to a third party company.

15            THE COURT:  So the defendant agreed to forfeit

16   $70,050 --

17            MR. WILLIAMS:  In addition.

18            THE COURT:  -- in addition to the specific

19   property.

20            MR. WILLIAMS:  Yes, Your Honor.

21            THE COURT:  And was that money that he had and

22   that has been delivered to the government?

23            MR. WILLIAMS:  I'm not aware that it's been

24   delivered to the government yet, but Mr. Denner can

25   correct me if I'm wrong.  I don't think it's been paid

1    yet.

2               THE COURT:  But he has agreed to forfeit the

3    $70,050 and agreed to the entry of a judgment in that

4    amount.

5               MR. WILLIAMS:  If, as Your Honor correctly

6    inquires, if it hasn't been paid and we're not aware

7    that it has been.

8               THE COURT:  All right.  Okay.

9               Why don't we take your witness now then so we

10   don't hold him up any further.

11              MR. WILLIAMS:  Thank you, Your Honor.  At this

12   time the government calls as a witness Rear Admiral

13   Michael Jabaley of the United States Navy.

14

15

16

17

18

19

20

21

22

23

24

25

1              REAR ADMIRAL MICHAEL JABALEY,

2              called as a witness, having been first duly

3              sworn or affirmed, was examined and testified

4              as follows:

5

6              THE CLERK:  Please state your name and spell

7    your last name for the record.

8              THE WITNESS:  My name is Michael Jabaley.  The

9    last name is a spelled J-A-B-A-L-E-Y.  I live in

10   Annandale, Virginia outside of Washington, D.C. and I

11   work in southeast D.C. in the Navy yard.

12             MR. WILLIAMS:  Thank you, Your Honor.

13

14                     DIRECT EXAMINATION

15   BY MR. WILLIAMS:

16   Q.   Admiral, can you describe briefly your duties in

17   responsibilities and duties in the current position?

18   A.   I'm actually between jobs.  My most recent

19   assignment was as Commander, Naval Undersea Warfare

20   Center, which is a cradle-to-grave engineering support

21   organization that provides both research and

22   development, capability delivery and in-service

23   engineering support to the submarine force.  I was also

24   the deputy commander for Undersea Warfare at the Naval

25   Sea Systems, also known as NAVSEA 07, which focuses on

1    the in-service maintenance of submarines.  I turned over

2    both of those duties two weeks and I'm in preparations

3    for my next assignment, which will be as program

4    executive officer, Submarines, which is responsible for

5    the acquisition of all submarines and submarine-related

6    equipment for the United States Navy.  So the

7    contracting and procurement of the Virginia-class

8    submarine, the future Ohio replacement class submarine,

9    all of the electronic systems which provide war-fighting

10   capability to those platforms, and the weapons and

11   defensive systems which they carry.

12              MR. DENNER:  Your Honor, if it would be

13   helpful, we are not disputing the bona fides of this

14   gentleman to be qualified as an expert in any of the

15   subjects that he is intending to testify to today.

16   BY MR. WILLIAMS:

17   Q.   In light of that -- actually, I would just ask you

18   as much as possible to address your remarks to the

19   Court.  We've already talked but the Court is the one

20   who needs to hear what you have to say today.

21   A.   Certainly.

22   Q.   It's fair to say then --

23              THE COURT:  I can hear you either way.

24   BY MR. WILLIAMS:

25   Q.   It's fair to say then that you had extensive

```
1    training and experience with nuclear submarines?
2    A.   Yes, I have.
3    Q.   And you've held several commands related to nuclear
4    submarines?
5    A.   Yes, I have.  I commanded the USS Louisville and
6    have had several commands since of higher
7    responsibility.
8    Q.   At one point were you more or less in charge of the
9    Virginia class of nuclear submarines?
10   A.   I was program manager for the Virginia-class
11   submarines from 2008 to 2012, a period in which we
12   completed and delivered four submarines.
13            MR. WILLIAMS:  Your Honor, as Mr. Denner has
14   already beat me to the punch, I realize without a jury
15   I'm not sure it's necessary, but at this time, at least
16   for the purposes of the record, the government moves
17   that Admiral Jabaley be declared an expert in the
18   operation and deployment of nuclear submarines.
19            THE COURT:  I don't think there is any
20   objection and he obviously is.
21   BY MR. WILLIAMS:
22   Q.   Now, you referred already to the Ohio-class
23   submarine, even though your specific, at least your
24   specific prior command was related to Virginia-class
25   submarines, you're also familiar with other classes of
```

1    nuclear submarines in the Navy's fleet?

2    A.    Yes, I am.  I've served on Los Angeles-class,

3    Ohio-class, Sturgeon-class submarines.

4    Q.    Now, as part of those duties, have you become

5    familiar with electronic components known, among other

6    things, as integrated circuits, or as I'll call them

7    from now on, ICs?

8    A.    Yes, I have.

9    Q.    Are ICs in fact installed on nuclear submarines?

10   A.    Yes, they are.

11   Q.    And I realize this may vary by the submarine, but

12   to give us some sense of proportion on a Virginia-class

13   submarine at least, what order of magnitude are we

14   talking about for the number of ICs that might be

15   installed on that submarine?  Thousands?  Tens of

16   thousands?  Millions?

17   A.    It would be in the tens of thousands.

18   Q.    Can you describe -- and I'm just looking for

19   representative, nonsensitive examples -- can you

20   describe some of the functions that ICs play on, for

21   instance, a Virginia-class nuclear submarine?

22   A.    Certainly.  I would group them into three broad

23   categories.  The first would be information services.

24   Like anything else today, we have computer networks on

25   the submarine for just doing work and communicating.  So

1    those of course are heavily dependent upon integrating

2    circuits.

3         There are war-fighting electronic systems.  So the

4    basic purpose of a submarine in particular missions is

5    to detect sound in the water, and then that sound is

6    processed by very powerful computer systems to generate

7    the best fidelity of sonar signal.  That is then passed

8    to what's called a combat control system which uses that

9    data to determine the location of the contact that

10   you're tracking.  That is also heavily dependent upon

11   computer systems and ICs.

12        And then the employment of the weapons, the weapons

13   themselves are heavily dependent upon ICs.  So that

14   war-fighting capability would be the second group.

15        And then the third group would be machinery control

16   systems.  So there are many remotely operated systems.

17   There are many controllers for electric components.  So

18   an electric pump or an electric motor will have a

19   corresponding control system which is based on

20   integrated circuit chips.

21        So you quickly rise above 10,000, into the tens of

22   thousands when you total them all up.

23   Q.   Now, are you familiar with the term "military-grade

24   IC"?

25   A.   Yes, I am.

1    Q.   Can you describe for the Court what that means?

2    A.   Military-grade integrated circuits are those which

3    have to be designed to work in more demanding

4    environments than the ones which would populate a laptop

5    computer, for example.  They may be subject to the

6    extremes of temperature, humidity, vibration, in the

7    worst case shock.  If an explosive weapon detonates near

8    the submarine we have to ensure that critical systems

9    keep working.  And pressure for those that might be

10   exposed to a variation in atmospheric pressure.  So

11   those chips are more rugged.  In many cases they are

12   tested more by the manufacturer and they are expected to

13   deliver a higher grade of reliability in operation.

14   Q.   Now, the Navy doesn't use solely military-grade

15   ICs, correct?

16   A.   No.  In many cases we use what's termed commercial,

17   off-the-shelf equipment, or COTS equipment.  This is a

18   balance.  There are different ways that you can account

19   for the environment in which these systems will be

20   operating, but we have found that it is better to strike

21   a balance in some instances by using COTS equipment and

22   then accounting for the requirements in other ways.  For

23   instance, on the Virginia-class submarine, the combat

24   electronic systems are mounted in what's called a

25   structurally integrated enclosure, or an SIE.  This is

1    essentially a cage which is hung from a supported deck.

2    Therefore, the deck structure itself takes into account

3    the vibration and the shock.  And then we have a range

4    which we maintain the submarine in temperature and

5    humidity to account for those requirements.  By doing it

6    that way you design that shock and vibration protection

7    in the beginning of the submarine and then you can

8    refresh the electronics within that enclosure on a

9    recurring pattern every four to six years to take

10   advantage of the phenomenal increases in computer

11   processing that we have going on in the industry today.

12   That way you can keep even a 33-year-old submarine

13   current in its war-fighting capability without the

14   expense of buying mil standard, military-grade computer

15   equipment every time.

16       But there are still applications that you can't

17   design in an enclosure to protect the equipment where

18   you do need military-grade chips.

19   Q.   And particularly for some of the commercial-grade

20   chips, is the Navy sometimes required to deal with

21   people known as brokers because these are chips which

22   are more or less obsolete, they're not being produced

23   anymore?

24           MR. DENNER:  Your Honor, with respect I'm not

25   going to object on the basis -- because I want this to

1    go along -- to leading questions, but I would rather

2    hear the information respectfully from the Admiral than

3    the Department of Justice.

4              THE COURT:  I thought that was a permissible

5    question.

6              You can answer the question, sir.

7              THE WITNESS:  Thank you, Your Honor.

8    A.   The Navy finds itself in a situation where the

9    other edge of that sword, the phenomenal advances in

10   computer power, the other edge of that sword is that

11   industry rapidly moves beyond.  So we are not as agile

12   as we would like to be because we have much greater

13   testing requirements.  This is usually felt in software.

14   Microsoft is on Windows 9 or 10 now and we still have

15   systems in the Navy that are based on earlier versions

16   that we're having to maintain.  The same holds true for

17   hardware.

18        To finish the analogy with the software, we can't

19   afford to find all the bugs in Windows 9 or 10 in the

20   first six months that its been released.  That's what

21   the population does.  The new software comes out and the

22   population finds the bugs and Microsoft fixes them.  We

23   can't afford that luxury because of the applications we

24   use computer software for.  So we have to go through

25   more testing, more certification, which means that we

1    rely on older systems for the period of time.

2         The same is true in hardware.  The obsolescence

3    management issue is as your components age, they may

4    continue to work but it becomes more difficult to find

5    the replacement parts because the chip makers don't sell

6    them anymore.  So to address that phenomenon, the market

7    has evolved to create a niche for chip brokers that when

8    a company starts, announces that it will no longer

9    manufacture and support a particular type of chip, they

10   will move in and they will buy the remaining stock from

11   wherever they can and they will hold that and then when

12   the Navy or other military services or applications,

13   such as NASA, needs replacement chips, they go to the

14   chip brokers and you can sustain yourself for a period

15   of time while you design, test and implement a

16   replacement system which no longer relies on those

17   obsolete chips.  So it's really an interesting market

18   that has grown up.  Then those brokers rely on a field

19   of vendors which go out and do their work for them.

20        So the broker is kind of a warehouse and

21   aggregation organization and then the individual vendors

22   go out and seek the chips and sell them to the broker.

23   BY MR. WILLIAMS:

24   Q.   So for example, if the Navy needs a Philips IC, it

25   doesn't always end up going directly to Philips to buy

1    that IC?

2    A.    That's absolutely true because, first of all,

3    Philips is not interested in selling chips one at a

4    time.   They're interested in large orders.   Then, as

5    they become obsolete, you have to go elsewhere anyway.

6    Q.    I know that you touched on this before, but can you

7    describe for the Court some of the extremes or stresses

8    that an IC might have to withstand when its installed in

9    a nuclear submarine engaged in combat operations, or at

10   least training for combat operations?

11   A.    Sure.   One of the most relevant examples would be

12   chips that are used in the control of outboard

13   equipment.   So for instance, all of the masts and

14   antennas that are used for communication, visual

15   observation, those are housed in the sail of the

16   submarine, the structure which rises above the cylinder,

17   and then the masts and antennas are raised above the

18   surface of the water while the ship is at periscope

19   depth so the ship remains covert and the mast and

20   antenna sticks out of a water.   Each of those masts and

21   antennas is heavily populated with electronic

22   components.   In many cases the design requires that

23   those chips be located in the very end of the antenna to

24   do the work, primarily because the sooner you can

25   process a signal without having to transmit a signal

1    without having to transmit over many feet of wire, the

2    more fidelity that you have in the signal, the better

3    you are to pick the important part of the signal out of

4    the noise.  We try to do as much processing as close to

5    the source as we can, which necessitates the location

6    and the extent of the antenna.  That is a way anything

7    you could design for an enclosure to account for shock

8    or vibration.

9         It's also subject to temperature extremes.  We

10   operate our submarines in the Arctic, so water at or

11   very near 32 degrees.  We operate our submarines in the

12   Arabian Gulf, so water above 100 degrees and the surface

13   temperature it well, well above that.  Those chips have

14   to be able to withstand those extremes.

15        Of course, we design them so they never get wet,

16   but there are cases where humidity will arise inside the

17   chip compartment, so they have to be able to withstand a

18   certain amount of humidity as well.

19   Q.   I want to ask you about a couple of specific uses

20   of ICs.  The government as part of its charges again the

21   defendant has alleged that at least some of the ICs he

22   sold were intended for use to test communication buoys

23   on nuclear submarines.  I understand that you haven't

24   seen that evidence and you don't know whether or not

25   those were supplied, but I'm just asking you to explain

1   to the Court what that function is all about.

2   A.    Sure.   A communications buoy is a critical piece of

3   equipment that's used on ballistic missile submarines.

4   So the ballistic missile submarines make up one-third of

5   nation's strategic nuclear deterrence triad:  Ballistic

6   missiles submarines one-third, long-range bombers

7   one-third and ICBMs in silo one-third.  So you have

8   land, air and see.  That triad has existed since the end

9   of World War II when we developed nuclear weapons.  It

10  provides strategic deterrence which has been very

11  effective to this day.

12        The one thing that makes the SSBN such an important

13  part of that triad, in addition to the covert stealth of

14  the submarine -- they're very hard to find -- they also

15  have to be in constant communications.  So the way they

16  do that is the submarine actually deploys a positively

17  buoyant buoy on a tether which rises to just blow the

18  surface so the submarine can remain at a classified

19  depth so it remains covert and then this buoy rides just

20  below the surface where it's able to receive what's

21  called very low radio frequency signals.

22        So the phenomenon of radio is the more penetrating

23  and reliable the radio signal is, the less bandwidth you

24  can pass communications on.  So this buoy doesn't get

25  full communications capability.  It gets very limited

1    messages but it's enough to alert the submarine when

2    something is going on so she can reel in the buoy, come

3    to periscope depth and put up a higher bandwidth antenna

4    to receive tasking, if necessary.

5         So that buoy is the linchpin of the communication

6    with the ballistic missile submarine while its on alert

7    patrol.  So clearly, that has to be a 100 percent

8    reliable piece of equipment.  We actually have two of

9    them in case something happens to one, but you only are

10   have one extended at a time.  If that buoy fails, the

11   immediate action of the submarine is to rapidly come to

12   periscope depth and reestablish communications that way

13   so that it ensures that it remains in constant

14   communications.

15        In order to make sure that that buoy is as reliable

16   as possible, we have buoy test sets that we use to test

17   the buoy each import period and then a final test before

18   deployed.  So a failure in that test set could either

19   cause an unnecessary expense or cause it falsely

20   indicated that there was a problem with the buoy and

21   then you go get a replacement, or in the opposite case

22   it could cause an unreliable system when you thought it

23   actually passed the test.  So the test set not working

24   as designed places at risk that linchpin of

25   communications system to one-third of our nuclear

1    deterrence.

2    Q.   I want to ask you about just one other example.

3    The government has also alleged that at least some of

4    the ICs sold by the defendant were intended for use in

5    the secondary propulsion system of the nuclear

6    submarine.  Can you confirm that ICs are used in that

7    system and then explain to the Court what the role of

8    the secondary propulsion system is.

9    A.   ICs are used in the secondary propulsion system.  A

10   nuclear-powered submarine is a very reliable piece of

11   equipment.  The nuclear reactor in particular, we've

12   successfully operated those for 65 years without major

13   incident and they've been extremely reliable in

14   operation.  However, there's an entire train of

15   equipment that comes off of that that ends in the

16   propeller turning and powering the ship.  That goes

17   through a serious of pinyons and gears and reduction

18   gears to translate the high speed turbines into a low

19   speed propeller.

20        There can and have been problems in that propulsion

21   train over the last decades.  In one case an attack

22   submarine out of Hawaii had a complete failure of

23   propulsion because of the catastrophic destruction of

24   one of the gears.  When that happens you can't turn the

25   propeller at all.  We have different means for turning

1    the propeller, the reactor and an electric mother.  But

2    if that gear itself is compromised, then you have to

3    lock the shaft and you can't turn the propeller at all.

4    In that case all you have left is the secondary

5    propulsion system.  The secondary propulsion, think of

6    it as an outboard motor for a fishing boat except it's

7    really, really big.  Normally it's folded up inside the

8    hull so you maintain your smooth profile as you're going

9    through the water.  But if you a have a failure of the

10   main propulsion system, you can, depending on the

11   design, either lower or extends out by rotating down

12   below the submarine and then it's again just an outboard

13   motor.  It will move the submarine at about one to three

14   knots, depending on current and water temperature and

15   things like that.  So it's very, very slow.  It would

16   take a long time to get home, but it does allow you to

17   make some headway.  In the case I was discussing with

18   the attack submarine it was until the ocean-going tug

19   was able to get all the way out and bring them back in.

20       It's the propulsion system of last resort.  It is

21   also used in maneuvering the submarine alongside the

22   pier.  When the submarine is mooring next to the pier,

23   normally we have tugs to assist it, but there are times

24   when you are pulling into a port in a foreign country

25   where they may not have the tugs available or you may

1    not be willing to rely on the capability of the tug

2    master, there are certain points on the hull where you

3    don't want the tug to maneuver because they're

4    structurally weaker than others -- the tugs in our home

5    ports all know that, overseas we're not as convinced --

6    so you may need to use the secondary propulsion system

7    which is trainable.  You can rotate it to maneuver the

8    stern of the ship.  There are a whole series of ways you

9    can do it.

10        The bottom line is the secondary propulsion system,

11    propulsion of last resort if you've had a casualty with

12    the main propulsion and then used for maneuvering close

13    into the pier in what we call an unassisted landing.

14        The integrated circuits which are used in the

15    secondary propulsion motor control things such as the

16    lowering and the retracting, the training for the

17    direction and then the on and off.  It's a single speed

18    motor.  So a failure in the integrated circuits which

19    control the secondary propulsion system could result in

20    that propulsion of last resort not being available, or

21    it could result in damage to the submarine because

22    you're maneuvering alongside the pier and you want to

23    use the secondary propulsion system to keep the stern

24    off the pier because you may have messed up and when you

25    push the "on" button, it doesn't come on and the next

1    thing you know the stern planes are into the concrete

2    pilings and you've damaged the submarine.

3         So that would be the potential route of failure of

4    the integrated circuits in the secondary propulsion

5    system.

6    Q.   Admiral, does the Navy generally tried to purchase

7    new, unused ICs?

8    A.   Yes.  The contract specifications for both

9    individual purchase orders and then system development

10   and procurement always specify that to the extent

11   practicable, the chips should be new, unused original

12   equipment manufacturer, OEM, integrated circuit chips.

13   As I discussed before, when you get into obsolescence

14   management, we understand that at times someone will

15   have to manufacture to replace the OEM chip, but we go

16   into that eyes wide open.  We apply additional rigor in

17   testing.  So that is an opportunity, but in as much as

18   practicable, we rely on new, unused OEM chips and we

19   expect that's what we get when we put that into the

20   contract specification.

21   Q.   What are the possible consequences if the Navy buys

22   a batch of chips which it believes are new and it turns

23   out they are not new, that they have already been in use

24   for several months or several years?

25   A.   Well, there is a phenomenon in electronics which is

1    known as the bath tub curve.  If you look at the age of

2    a component and the numbers of failures in a large group

3    of that, so say you make 10,000 of a single numbers of

4    chips.  Perhaps 100 of those will fail in the first 10

5    days of operation.  So you have a fairly high failure

6    rate.  That's called infant mortality.  Then, for an

7    individual chip, once you get past that 10 to 20 days,

8    then you have very low failure rate for years.  That's

9    the normal operating range.  Then at the end, on the

10   other side of the bath tub, that failure rate spikes up

11   again as chips reach the end of life and they wear out

12   because everything has an end of life.

13        So when we buy chips, first of all, we expect them

14   to have been what we call burned in.  So the

15   manufacturer manufactures the chip and then operates it

16   for a period of time to get through that infant

17   mortality phase and weed out the ones that are going to

18   burn up right away.  So when we buy the chips we're

19   expecting them to all be right here at the beginning of

20   the flat part of the bath tub.  We expect them to

21   operate for years and then we recognize that they'll

22   start to fail at the end so we either have a programmed

23   upgrade or replacement at some point before we reach the

24   end of life.

25        If a chip has already been used, it may be over

1     here on the bath tub curve, much closer to the end of

2     life.  So it might work right away when you put it in,

3     but then it might fail within one year instead of 15

4     years because you weren't back here at the beginning of

5     the flat part of the bath tub, you were much closer to

6     the end.  That's one possible consequence of a buying a

7     used chip unknowingly instead of a new chip.

8         The other consequence is that it might not be the

9     chip that its advertised to be.  There are several

10    different classes of problems with chips.  The one I

11    just discussed was a used one instead of a new one.  If

12    the chip has been relabeled, so each -- when you look at

13    a circuit board and they have these chips soldered in

14    there, on the face of the chip will have a stamp with

15    the manufacturer, origin and the date and some

16    identifying part number.  It's a phenomenon that we have

17    seen is that at times that will all be scraped off and

18    then restamped with a new date of manufacture or perhaps

19    an OEM stamp which is different from what the chip

20    really is.  You can determine that through electronic

21    testing because there's an electronic signature on the

22    chip as well, but that is not something you do to every

23    chip that you buy.  You're looking at the stamp.  So

24    that would be another problem.

25        There are others farther afield that I could

1    continue with buying chips on the open market.

2    Q.   Do chips of unknown origin sometimes contain

3    malware, or at least is it possible they could?

4    A.   It is certainly possible and that is something that

5    we're very concerned with.  We know that there are other

6    countries in the world that have active programs to

7    insert malware in any sort of integrated circuit chip,

8    any sort of processing system, any sort of appliance

9    that you could think of and many that you couldn't think

10   of.

11        It is -- I'm not an expert in what we have actually

12   found to date, but I know that there is a significant

13   concern that in particular China is scavenging old

14   electronic equipment, restamping it to make it look new

15   and it would be a simple matter to reprogram a chip and

16   insert malware in it, either by manufacturing a new chip

17   and stamping it to look like it's something else or

18   taking a used chip and then reprogramming it.

19        So there's an infinite range of possibilities of

20   what could be done in that case with the smart enough

21   and devious enough adversary.  That is, again, why we go

22   back to that contract specification; that to the extent

23   practicable, the chips will be new and unused and

24   OEM-manufactured chips so we know what we're getting.

25   Q.   If I understand you correctly, although the Navy

1    with fairly extensive testing, can figure out whether a

2    chip is authentic, in many cases the Navy relies on the

3    external markings?

4    A.   Yes.   It's cost prohibitive to test each one of

5    the -- you take tens of thousands on each submarine and

6    you extrapolate it, beyond that, near the hundreds of

7    thousands, it's cost prohibitive to test each chip prior

8    to installation.   We do a sampling program with

9    manufacturers and then we're also intrusive into our

10   prime contractors to understand what kind of testing

11   programs they have with the companies from which they

12   buy the chips.   But again, it is cost prohibitive to

13   test each one.   So yes, we rely on the stamp.

14   Q.   Following up on that, the government suggests it's

15   been generally well documented that there are

16   counterfeit parts in the military supply chain, not just

17   from this defendant but from many other actors.   Has the

18   presence generally of those counterfeit parts and not

19   necessarily knowing where they are meant that the Navy

20   has had to increase the amount of its these very

21   expensive, time-consuming testing?

22   A.   Absolutely.   I will tell you that it is on the

23   rise, both from a supplier quality standpoint, both

24   negligence and malfeasance.   We recently reorganized our

25   divisions at the Naval Sea Systems command to take the

1    supplier quality group, which was subordinate to the

2    industrial facilities manager who runs all the

3    shipyards, the supplier quality group was removed from

4    shipyards and put in its own directorate because of the

5    increasing importance of monitoring and taking

6    corrective action when necessary for supplier-quality

7    issues.

8         As I alluded to, there are two main categories:

9    Negligence where a manufacturer is not applying the

10   proper material characteristic properties in the

11   fabrication of components versus malfeasance where a

12   company intentionally goes out and supplies the wrong

13   material to the government.  So two different parts of

14   the same problem, but both on the rise and both of very

15   increasing concern.

16   Q.   For example, what must the Navy do if it determines

17   that counterfeit ICs did already enter the supply chain

18   and in fact have been installed on mission critical

19   equipment?

20   A.   Well, when a station such as that arises, we go

21   through a bounding process where we try to understand

22   the extent of the problem.  So we start with, okay, we

23   have found an improper component on a submarine.  And

24   then you have to trace it back.  Where did it come from?

25   As you might expect, for mission critical equipment we

1    keep very detailed records on what component was

2    installed where and what the provenance of that was,

3    where it was purchased, where it was tested, who tested

4    it, et cetera.  So in general we can track back to its

5    source.  Then we go back and do a full investigation at

6    the source and find out was it a case of one quality

7    inspector not understanding the correct standard and

8    letting stuff pass through that was not good, or was it

9    a case of one person acting illegally for profit or for

10   whatever reason and supplying purposefully wrong

11   material.  In either case we try to bound it by what is

12   the extent of the number of components that could have

13   originated from that source and then where did they go.

14   Many times it will lead well beyond the submarine force.

15   We have had issues where with what started with one bad

16   component on a submarine grew to not just that component

17   but other components that we found installed on

18   submarines, on aircraft carriers, on surface ships.  We

19   have to follow the trail where it leads.  Very

20   time-consuming, very expensive, may require

21   interruptions to the operations of equipment or ships,

22   and then may require a full-fledged effort to go find

23   each of those individual components, remove them, test

24   them and if they're okay, continue to use them.  If not,

25   remove them and replace them with a known good item.  So

1    it's horrendous.  The sad reality is that any one time

2    we have two or three of these cases going on.

3         In many cases, through additional engineering

4    analysis we can determine that that lot of piping which

5    may not have been properly annealed when the metal was

6    fabricated is still okay.  There will be indications

7    that we get before it fails so we're comfortable to

8    continue operating until it can be replaced somewhere

9    down the line.  But in some cases we have to interrupt

10   the operation.

11        There were stories in the paper this week about

12   we've had to tie up three of our submarines because of a

13   piping issue that has been found in new construction.

14   So that's -- it's not the worst possible case.  The

15   worst possible would be catastrophic failure causing

16   damage and injury, but it's right next to the worst

17   possible case.  That can be the end result of a quality

18   or a counterfeit or an improper material provision

19   exercise.

20        So bounding the problem, understanding where it all

21   went and then taking actions to either account for its

22   presence in the system or replace it if necessary.

23   Q.   Just to bring us a little closer to home, I just

24   want to confirm that the Naval Submarine Support Center

25   in Groton, Connecticut is one of the places where ICs

1    intended for use in nuclear submarines would be shipped?

2    A.    Yes.    The Naval Service and Support Center is a

3    purchasing activity and an administrative support to the

4    submarine squadrons there.    They purchase equipment for

5    the Naval Submarine Support facility, which is the

6    repair organization in Groton.    So when the NSSF needs

7    to repair equipment, they contract through the NSSC to

8    buy the necessary parts on occasion.    So yes, they are

9    an authorized purchasing agent for the Navy.

10    Q.    Earlier you had discussed a couple of specific

11    examples where ICs are used in nuclear submarines,

12    examples which the government has alleged anyway that

13    where the ICs sold by the defendant were headed.    One

14    was testing for a radar buoy and the other was a

15    secondary propulsion system.    Is it fair to say that if

16    ICs installed in either of those systems failed, that

17    the systems could fail?

18    A.    Yes.    I'll correct one thing you said.    It was not

19    a radar buoy but a communications buoy.    But yes,

20    failure of the ICs within those circuits could lead to

21    the failure of the system, yes.

22    Q.    I'm going to end here with what will sound like

23    10,000-foot questions, that's because they are

24    10,000-foot questions, but they harken back to the

25    language of the statute which the defendant pled guilty

1    to.  At least based upon your training and experience,

2    could the failure of these systems impair combat

3    operations?

4    A.   Absolutely, yes.

5    Q.   And again, based upon your training and experience,

6    could failure of these systems cause significant harm to

7    national security?

8    A.   Yes.  Absolutely.

9              MR. WILLIAMS:  No further questions at this

10   time, Your Honor.  Thank you.

11             THE COURT:  Thank you.

12             MR. DENNER:  May I, Your Honor?

13             THE COURT:  Certainly.

14

15                    CROSS-EXAMINATION

16   BY MR. DENNER:

17   Q.   Good morning, sir.

18   A.   Good morning.

19   Q.   We met today for the first time, yes?

20   A.   That is correct.

21   Q.   We had never discussed this case before today?

22   A.   You and I, no.

23   Q.   You are not suggesting that any of the ICs that

24   were in the possession of the defendant or his company

25   that you know got to the Navy in any way, shape or form,

1    correct?

2    A.    That is correct.

3    Q.    And you're certainly not suggesting that anything

4    that he has done has caused any actual harm -- and

5    believe me, I accept the seriousness of this crime and

6    the national defense issues that are involved here --

7    but you're not suggesting that anything he has done has

8    caused any harm to any nuclear submarines or any other

9    naval vessels, correct?

10   A.    I have no knowledge of that, that is correct.

11   Q.    Do you have any knowledge, personally yourself, of

12   this defendant or his company?

13   A.    No, I do not.

14   Q.    Do you have any knowledge of how long duration of

15   the conspiracy the counterfeit military goods he has

16   pled guilty to?

17   A.    I have read the indictment, yes.

18   Q.    But you understand it's a three-month period, yes?

19   A.    I do, yes.

20   Q.    And I think earlier today you had suggested that --

21   and I'm sure very correctly -- that this is a growing

22   and very serious problem and threat to the national

23   defense?

24   A.    That is correct.

25   Q.    And your testimony with respect has been incredibly

40

1    helpful and very eloquent today.  Do you do this much,

2    this kind of testimony in different cases?

3    A.   This is the first time I've testified in a case

4    such as this.

5    Q.   So it would be fair to say there's thousands of

6    brokers in this particular defendant's position,

7    correct?

8    A.   I do not know that for a fact.

9    Q.   Well, you do know that there are many, many

10   indictments around the country, including in this court,

11   other indictments for these kind of cases, yes?

12   A.   I don't have a knowledge of a number, but I'm aware

13   that there are other cases where counterfeit material

14   has been offered for sale to the Navy, yes.

15   Q.   This is the very first time that you have ever come

16   to court to describe the seriousness of this type of

17   conduct, yes?

18   A.   That is correct.

19        MR. DENNER:  I have no further questions, Your

20   Honor.

21        MR. WILLIAMS:  No further questions, Your

22   Honor.

23        THE COURT:  Thank you, sir.  You may step

24   down.

25        THE WITNESS:  Thank you very much.

1          MR. WILLIAMS:  Your Honor, the government

2    would ask whether the Court has any further questions of

3    the witness or requires his continued presence at the

4    sentencing hearing.

5          THE COURT:  I have no further questions and I

6    do not requirement his continued presence.

7          MR. WILLIAMS:  And defense counsel?

8          MR. DENNER:  I do not.

9          MR. WILLIAMS:  The government would ask that

10   Admiral Jabaley be excused.

11         THE COURT:  He may be excused.

12         MR. WILLIAMS:  With our thanks.

13             (Whereupon, the witness was excused.)

14         THE COURT:  Let's address the Presentence

15   Report and the objection to the report.

16         Mr. Denner, have you had an opportunity to

17   read the Presentence Report as amended?

18         MR. DENNER:  I have, sir.

19         THE COURT:  And has your client read it or has

20   it been summarized for him by you?

21         MR. DENNER:  Both.

22         THE COURT:  Does the defendant have any

23   corrections or objections to the report as amended other

24   than with respect to Paragraph 35, which is the

25   enhancement pursuant to Guideline

1    Section 2B5.3(b)(5)(A)?

2              MR. DENNER:  Other than that, Your Honor, no.

3              THE COURT:  Thank you.

4              Mr. Williams, has the government had an

5    opportunity to read the Presentence Report as amended?

6              MR. WILLIAMS:  Yes, Your Honor.

7              THE COURT:  And does the government have any

8    corrections or objections to the report as amended other

9    than with respect to Paragraph 35?

10             MR. WILLIAMS:  Yes, Your Honor.  And this is

11   actually -- unless this is what Paragraph 35 deals with.

12   Your Honor's clerk had reached out to the parties

13   yesterday to ask whether the maximum supervised period

14   of release should be --

15             THE COURT:  Paragraph 79.

16             MR. WILLIAMS:  Yes.  Actually, the government

17   appreciates the Court's question because not only is the

18   Presentence Report incorrect in stating that the maximum

19   supervised release period is five years -- it's actually

20   three years -- but the parties' own plea agreement

21   mistakenly indicated it was five years, not three years.

22             So the government, unless there's any

23   objection from counsel, would suggest that both the

24   cover page, which also lists the five-year period, and

25   Paragraph 79 be corrected to reflect the maximum period

1    is in fact three years, not five years.

2            And while I believe this doesn't appear in the

3    Presentence Report itself, just in the plea agreement,

4    in the plea agreement, which the magistrate went over

5    very carefully with the defendant at the time of his

6    plea, the magistrate, relying on the mistake in the plea

7    agreement, indicated that the defendant, if he violated

8    the terms of his release, could be recommitted for an

9    additional period of three years.  In fact, that should

10   be two years.

11           THE COURT:  Yes.  Thank you.

12           MR. DENNER:  We join that.  I thought perhaps

13   that was rectified yesterday when we got that notice.

14   But to the extent it hasn't, we certainly join, Your

15   Honor.

16           THE COURT:  Okay.

17           Pursuant to Title 18 United States Code

18   Section 3553, one of the factors the Court must consider

19   in determining the particular sentence to be imposed in

20   this case is the Sentencing Guidelines.  Consideration

21   of the Sentencing Guidelines requires determination for

22   this case of the applicable Guidelines range, which is

23   based on the total offense level and the applicable

24   criminal history category.  The Presentence Report

25   currently calculates the total offense level to be 23

```
1    and the criminal history category to be Category I.

2            The parties object to Paragraph 35 of the

3    Presentence Report.

4            I note the following findings and

5    modifications to the Presentence Report:

6            In Paragraph 35, there will be no two-level

7    enhancement pursuant to Guideline Section 2B5.3(b)(5)(A)

8    of the 2012 manual in light of the language in the

9    Stipulation of Offense Conduct for the reasons explained

10   by the government in its sentencing memorandum.

11           In Paragraph 39, the adjusted offense level

12   then becomes 24.

13           In Paragraph 43, the total offense level

14   becomes 21.

15           In Paragraph 77, because the total offense

16   level is 21, the Guideline imprisonment range is 37

17   months to 46 months.

18           On the cover page and in Paragraph 79, because

19   we have a Class C felony, the maximum supervised release

20   term is three years.

21           In Paragraph 85, because we have a change in

22   the total offense level, the fine range is $7,500 to

23   $5 million.

24           And finally, based on a discussion earlier

25   today, in Paragraph 87 the amount for restitution is
```

1    $352,076.

2          With this finding and these modifications and

3    there being no objections to the other factual

4    statements contained in the Presentence Report as

5    amended, the Court adopts those statements as its

6    findings of fact.

7          I direct the official court reporter to make a

8    written record of this finding and these modifications

9    as to the Presentence Report.  And I also direct the

10   Clerk and the United States Probation Office to append a

11   copy of this record that is hereafter made available to

12   the Bureau of Prisons.

13         The defendant in this case, Mr. Picone, faces

14   a possible maximum sentence for imprisonment for

15   20 years.  He faces a supervised release term of as much

16   as three years.  If he violates any condition of

17   supervised release the Court then could sentence him to

18   additional time in prison of as much as two years.

19         In addition, the defendant faces a possible

20   fine of as much as the greater of $5 million or twice

21   the gross gain to the defendant resulting from the

22   offense or twice the gross loss to others resulting from

23   the offense.

24         Also, under Title 18 United States Code

25   Section 3663A, the Court must order restitution.

1            Finally, under Title 18 United States Code

2     Section 3013, I must impose a mandatory special

3     assessment of $100.

4            Mr. Williams, is the Court's statement of the

5     maximum sentence in this case accurate?

6            MR. WILLIAMS:  Yes, Your Honor.

7            THE COURT:  And Mr. Denner, is that your

8     understanding as well?

9            MR. DENNER:  Yes, sir.

10            THE COURT:  Thank you both.

11            The total offense level here is 21 and the

12     defendant's criminal history category is Category I.

13     For that total offense level and criminal history

14     category the Sentencing Guidelines suggest imposing the

15     following sentence:

16            A term of imprisonment in the range of 37

17     months to 46 months, a one- to three-year term of

18     supervised release, a fine in the range of $7,500 to

19     $5 million, restitution in the amount of $352,076 and a

20     $100 mandatory special assessment.

21            Ms. Chester, is the Court's statement of the

22     Sentencing Guidelines calculations in this case

23     accurate?

24            MS. CHESTER:  Yes, Your Honor.

25            THE COURT:  Thank you.

1          Before we proceed further, Mr. Denner, I would

2    like to give you an opportunity to make any statements

3    that you'd like to make on be of ha of your client.

4          Mr. Picone, if there's anything you'd like to

5    say, sir, I would certainly be very interested in

6    hearing that as well.

7          I do note I want to flag for people's

8    attention, there's a letter from the defendant that was

9    attached to the sentencing memorandum.  We received the

10   financial statement this morning.  There's an additional

11   statement I found in with those materials as well.

12          MR. DENNER:  Yes, Your Honor.

13          THE COURT:  And I read them both.

14          MR. DENNER:  Your Honor, that letter was

15   actually somewhat similar to the Exhibit 2A that we put

16   in our sentencing memorandum.  It should not have been

17   in the financials today.  We put that together rather

18   quickly downstairs at Probation today.

19          THE COURT:  Would you like that removed?

20          MR. DENNER:  It could be removed, yes, Your

21   Honor, please.

22          THE COURT:  Okay.

23          MR. DENNER:  It was simply what he was going

24   to in his allocution say to this Court.  Since the Court

25   has read it I've suggested to him that will no longer be

1    necessary and he will make up his own mind when we reach

2    that point.

3              THE COURT:  If he wants to simply read it,

4    that will be fine.  I'll return it.

5              MR. DENNER:  May I approach?

6              THE COURT:  Yes.  He can emphasize certain

7    parts or however he wishes to use it.

8              MR. DENNER:  Thank you, sir.

9              Your Honor, most of what I would say to this

10   Court I've said already in my sentencing memorandum

11   which I know the Court has carefully considered so I

12   don't intend to be unduly redundant.

13             What I would say to Your Honor is that this is

14   a case that, particularly as a former military guy

15   myself, causes great concern to me as I'm sure it does

16   to everyone.  These are serious charges.  Whether you

17   conspire for three months or three years or three hours

18   to effect issues that could affect, whether it does or

19   not, the national security interests of the United

20   States, particularly during times likes this, is very,

21   very serious.

22             What I'm going to say to this Court will come

23   from my head and my heart and is not meant to excuse

24   anything he has done, because I have -- for a variety of

25   reasons, this is a hot button for me too.  But I will

1    tell you that this is an intersection if not a collision

2    between an incredibly challenged and impaired man and a

3    very serious issue.  It simply is.  I will at the end of

4    my presentation today to this Court suggest that parity

5    in sentencing, particularly in this Court, will also

6    require the Court to take -- I would ask the Court,

7    excuse me, I don't require the Court to do anything --

8    but I will ask the Court to take into consideration, as

9    it does in every case, this defendant in context and not

10   just the crimes he's charged with and to understand that

11   other people who are, respectfully, far greater

12   culpability, much bigger arms brokers and electronics

13   brokers than he is with integrated -- the ICs in this

14   Court are being treated very differently.  And when I

15   found that out, which I will present to this Court, that

16   troubled me greatly, greatly.  And this is not casting

17   aspersions on anyone.  I understand every case is taken

18   on its own merits.

19          But I will tell you, you have an individual

20   here that we have not created for this Court.  We have

21   not weaved him out of whole cloth, at least the issues,

22   the mitigating issues that we suggest exist for this

23   sentencing.  This is a man who, at a very early age,

24   mid-teens, began to experience great anxiety, depression

25   and panic attacks.  Panic attacks of a disabling nature,

1       panic attacks that are cognizable in the Diagnostic and

2       Statistical Manual.  Diseases who sent him to doctors

3       and made him from 15 to 42, that have resulted in him

4       literally, intermittently not being unable to not just

5       work, but not function for many months at a time, up to

6       18 months of not being able to leave his house because

7       he's agoraphobic.

8              In the medical records Your Honor has, he has

9       been diagnosed with a very serious, long term

10      depression.  He's been diagnosed with general anxiety

11      disorder, both of which I respectfully suggest are

12      Axis I.  In the multi-axial model of the DSM, Axis I are

13      among the most serious mental diseases.

14             In the context of these panic attacks that

15      he's had he is essentially disabled.  He has

16      agoraphobia.  He can't leave the house.  This comes up

17      constantly in the medical documents I provided to the

18      Court, starting at 15, 16 going forward, and certainly

19      during this offense conduct.  And he has been not only

20      diagnosed with these mental disorders, Your Honor, but

21      he has been medicated for them.  And the medications

22      he's taken sometimes are as disabling and as challenging

23      as the underlying psychopathology itself.  He has been

24      on a series of antidepressants, antianxiety and

25      antipsychotics.  A lot of the medications -- one of the

1   medications is an antipsychotic, which means his

2   depressions are so disabling that his own view of the

3   world is distorted.  That has happened to him

4   intermittently.

5          Despite that, despite that, you also see that

6   in the letters.  You see that not only in the medical

7   records but you see that in the letters from the people

8   who know him his best; his wife, his parents, his

9   friends.  You can see that he has been fighting a war, a

10  war against the underlying psychopathology, the

11  miswiring, whether it's of a chemical nature, a

12  neurological nature.  And often he's made worse if not

13  further disabled by the medication.  And despite all of

14  that, despite all of that, he has valiantly struggled

15  constantly to make a life.

16         He was so ill by the time he got to ninth

17  grade he couldn't continue in this school.  He dropped

18  out of school in the ninth grade and made a life for

19  himself.  One of the great ironies of this case -- and I

20  take this very seriously because I've heard it from a

21  lot of his friends and family -- is that he really

22  considers himself a patriot and he loves this county.

23  The notion that he could have done anything that would

24  have had the Admiral come up here and tell this Court --

25  as I said, very eloquently and completely -- about the

1   danger in the 21st Century we face from this, it

2   dissembles him.  It is so horrifying to him that he

3   could have ever put himself, or more realistically, this

4   country in any risk at all.

5            It doesn't matter that he was kind of not a

6   big player in this and that his circuits probably never

7   got there, that doesn't matter to him.  He's fighting

8   against odds.

9            Joining the United States Army, as Your Honor

10  sees in the records, and actually was in a combat zone.

11  He never actually fought, but he was part of an air

12  shield division and they were always ready to be

13  deployed.  There was constant pressure.  I think you

14  might have seen the letter in the exhibit that we gave

15  you from an Army -- a current Army sergeant major that

16  worked with him, that served with him.  It guess it was

17  Operation Iraq Shield where there were constantly ready

18  to be deployed.  He tells you that the word that comes

19  up an in all of -- in many of these letters, that this

20  is a stand-up guy with integrity.  And Sergeant

21  Williams, who is still serving overseas right now in

22  southwest Asia, tells you that this is one of the finest

23  guys he served with.  He ended up having his first major

24  hospitalization and resulting PTSD from the result of

25  being overseas and put under this pressure.

1          But he tried.  Here's a guy who before he went

2    over there wasn't sure he could get off the couch all

3    the time.  Had great difficulty.  Couldn't finish

4    school.  Had great difficulty holding jobs.  Went from

5    job to job because he would have these attacks where he

6    couldn't literally leave the house, according to his

7    family, for weeks and sometimes months at a time.

8          When you look, respectfully, at the

9    medications he took early on, he was taking about nine

10   different things at a time that doctors were giving him

11   and it was even making it worse.  He fought through all

12   this and spent two years in the Army until he had a

13   complete meltdown.  Came back and was essentially

14   disabled for a good period of time.  He was in therapy

15   but still getting all these medications.

16         He told you in his own letter -- and his

17   family will tell you as well and has told you -- that

18   during this time he had periods of lucidity and periods

19   where he absolutely just didn't understand dream from

20   reality.  And that's hyperbole coming from most people.

21   It is.  It's hyperbole.  Yeah, yeah, yeah.  I have

22   difficulty between fantasy and reality.  But with

23   respect, I've gotten to know him over the last years and

24   I absolutely suggest to the Court that this is exactly

25   what happened to him.

1           When I went through the offense conduct, he

2    didn't say he didn't do it.  He would look at me with

3    tears in his eyes and say I can't remember.  I don't

4    know what happened during that period.  I could not get

5    a job anywhere else.  I was working at home.  I was

6    trying to work 20 hours a day.  He has two beautiful

7    children, a wife.  He's trying to support them.  He was

8    always going kind of paycheck to paycheck, month to

9    month, doing the very best he could in life.  And you

10   have the one individual who has done whatever he can do

11   to get give back to his family, to his community, and

12   ironically, to the national defense, and on the other

13   you've got this guy who can't go out and get a regular

14   job, who's doing this at home, who literally is

15   absolutely unable to handle what is going on.  He can't.

16   He can't handle it.

17           He has pleaded guilty to doing this.  He has

18   pleaded guilty to doing this.  But I would suggest to

19   this Court, if he took a polygraph, he would not

20   remember a great deal of what went on.  He is guilty of

21   it.  He did it, he did it knowingly, but he also did it

22   with a very intermittently distorted reality.  He was

23   far more concerned with surviving than he was in

24   understanding what he was doing.

25           He was reflexively going through this.  That

1    doesn't excuse anything.  I'm not suggesting for a

2    second that it does, but that's what you have here.  You

3    have an individual who was incredibly challenged,

4    demonstrably so, who respectfully, I think, if you're

5    talking even from a departure analysis under the

6    diminished capacity or, as Probation pointed out, which

7    is some diminished capacity under Section 5H1.1 --

8    excuse me -- 5H1.3 and 5H1.11, whether it's the military

9    service or whether it's just general mental and

10   emotional conditions that exist outside the normal

11   extent that people have them, respectfully, he's a

12   poster child for that departure.  To suggest that during

13   this time period, whether you count it as January of

14   2012, April of 2012 or the 2007 to 2012 period that he

15   actually was doing this -- I don't want to mince things,

16   he was -- and there were times he couldn't work for

17   months at a time, but I would suggest it was a longer

18   period of time.  They may have only -- not simply

19   because that statute came in 2011, because we're only

20   talking about three months in 2012, but he was

21   charged -- for transparency, he was charged with wire

22   fraud and, as many people who are charged with these

23   offenses are both charged with wire fraud and conspiracy

24   to traffic in counterfeit military goods and

25   trafficking, we chose the conspiracy because of the

1      Guideline numbers.  They were lesser than the wire

2      fraud.  But the conduct is during that period.

3              For a great deal of time during that period,

4      when you look at the medical records, when you look at

5      the letters, he just wasn't with us.  He simply wasn't

6      with us.  It would be weeks and months at a time he just

7      couldn't do anything.

8              So I respectfully suggest that whether you're

9      looking the a variance model under 3553(a) or you're

10     looking at a departure model under a Guideline analysis

11     that this gentleman clearly was suffering from mental

12     issues that contributed mightily to his offense conduct.

13     That's simply the case.

14             And when you look at the rest of his life

15     where he literally was a stand-up guy for everybody when

16     he was able to even get out of the house, was a really

17     good father to his children, a good husband to his wife,

18     a good son to his parents and a good friend to both the

19     people he knew in the military when he was there and

20     outside the military, he's given life absolutely his

21     best shot at every point.  And clearly, this criminal

22     conduct, we're not arguing for any consideration under

23     aberrant behavior theory because the conduct went way

24     too long for that, but there's such powerful mitigating

25     factors in his life.

1              There's another case in this court that has

2      recently come to my attention.  There are two

3      defendants, a gentleman named Jeff Krantz, who worked

4      under the Harry Krantz Company, and a guy named Jeff

5      Warga, who had something called The Bay Company,

6      particularly the Krantz Company.  He has done some

7      business with them.  They, as I understand it, are on

8      for sentencing in November of 2015.  I think it's done

9      by the U.S. Attorney's Office rather than DOJ as the

10     primary prosecutors.  But I will tell you that this

11     gentleman does exactly what he does, but he does it

12     about 10 times as much because his normal gross last

13     year was $17.5 million.  At best, his gross was probably

14     two and a half to $3 million and most years it was

15     considerably less than that.  He and Mr. Warga were

16     major, major players in this industry.  Mr. Krantz's

17     Guideline numbers, he has an opportunity to appeal any

18     sentence that is in excess of 10 months.  So he's in the

19     zero- to 10-month range.  And I am informed that

20     Mr. Warga, if in fact Mr. Krantz and he finish this case

21     as they started, Mr. Warga is thinking he's getting

22     straight house arrest or probation.  These people are

23     serious players in this industry.

24              Now, I know that every case is fact driven and

25     that driven and case specific and whatever, but the

1    disparity between someone who's 10 times as active in

2    this business as he is -- and I'm informed today by the

3    government that Mr. Krantz has -- and they haven't had a

4    lot of time to think about it either because I just

5    found out about it and brought it to their attention --

6    has put something on his website apologizing and doing

7    PR and a variety of other things.  I know nothing more

8    about the case other than it's a wire fraud case he's

9    pleading to, but he could have pled to wire fraud too.

10   The underlying allegations were all in trafficking

11   counterfeit military goods.  And he is a bigger fish, a

12   much bigger fish.

13          Certainly, I'm pretty sure the admiral is not

14   going to be testifying in his case for whatever reason.

15   I'm not trying to be cute or sarcastic about that.  I

16   find it interesting that in all the serious cases that

17   arise in this country and in this region that relate to

18   this kind of activity that it was necessary or

19   prudent -- I'm not being critical -- to bring an admiral

20   here.  I was a private in the Marine Corps.  Admirals

21   are real high for me.  To bring an admiral here in this

22   case of an individual who serious crime but not a

23   serious offender.  This man is a seriously mentally

24   challenged person over the years who has been doing

25   nothing but taking psychoactive medication literally

1    since 15, has tried his best to raise a family, to do a

2    business, to serve this country in the United States

3    Army under combat conditions, has had periodic

4    psychiatric meltdowns, for the me, the notion that we

5    brought this very fine gentleman here from Virginia as

6    an admiral in the United States Navy, to choose this

7    case versus that case, or a lot of other cases I'm aware

8    of, to tell this Court what the incredible danger posed

9    to national security is by this guy and the kind of

10   actions this guy takes, though I understand it on some

11   levels -- if he were testifying as to truly, truly

12   culpable people with no mitigating circumstances who are

13   actually out there making tens of million dollars on

14   this over time, I would understand that.  The notion

15   that this is the first time that someone with his

16   credentials who's been running these programs that the

17   government has found it necessary to bring him here, or

18   prudent to bring him here to court, it's one of few

19   things that actually almost makes me speechless.  It

20   does.

21            If you take a look at this individual and you

22   balance the equities -- bad, bad crime but not a bad

23   offender -- somebody who, for a variety of reasons

24   failed, failed himself, failed his country, whatever.

25   But balance it off against the challenges he's had and

1      all the things he's tried to do right and has done right

2      in his life, this is a guy we have to bring a naval

3      admiral in?

4             In any event, it doesn't make sense to me.

5      I'm asking the Court, as you do in every case, take a

6      look at the offender as well as the offense.

7             I respectfully think that this man needs

8      psychiatric treatment.  He obviously needs to stay out

9      of any industry that relates to the national defense in

10     any way shape or form.

11            As an aside, in the Krantz case, one of the

12     things that Jeff Krantz from The Krantz Company cannot

13     do is work any more in the electronic defense industry.

14     His father, Harry Krantz, is coming back in and going to

15     take over the company.  They're not losing the company.

16     Again, that's not formally part of this case, but parity

17     in sentencing and fairness I respectfully suggest is

18     always part of a case.  And the notion that Krantz is

19     charged with a four-year conspiracy, that their business

20     was worth probably 10 times every year what his is

21     worth, and he's walking a way presumably with zero to

22     10 months and his co-conspirator is walking away with

23     probation and house arrest -- I have that on a very

24     reliable information on the record too -- if it's more

25     than 10 months then he gets to appeal his sentence.

1    That's generally meant to me in my 43 years of practice

2    that -- I haven't seen the agreement yet -- they've

3    agreed on a zero- to 10-month Guideline range.  He's got

4    a zero- to 10-month Guideline range.  And whether they

5    chose to charge him, for whatever the reason, with some

6    discrete -- in our case they're suggesting that with the

7    related conduct, the government here says everything he

8    did, all the gross should be taken into consideration.

9    All the gross should be taken into consideration.  I

10   objected to that and Your Honor said no to them with

11   that.  But in Mr. Krantz's case, for whatever the

12   reason, they're going to say it's discrete things he

13   did, we're not going to bring in this whole thing

14   although that's all his company does.  Probably in four

15   years they brought in $70 million and are charging him

16   with little enough to keep him down there.  I would

17   respectfully suggest to you that that is just not right.

18   If Your Honor needs to continue this hearing so I can go

19   out and get all the specifics about that case and try to

20   get other documents that were filed in that case so Your

21   Honor can make some judgments for yourself if you think

22   it's relevant about parity in sentencing, then I would

23   ask for that as well.

24            The thing is when you take this man, what he's

25   been up against and what he's accomplished in life, I

1    think the notion of putting him in jail for 37 to 46

2    months, or respectfully in jail at all rather than give

3    him an alternate sentence where he's treated, where he

4    is in some kind of house arrest, if he has to do some

5    community confinement center for a period of time but

6    stays with his family, gets well, gets rehabilitated, I

7    think this is the kind of man who's earned that right.

8              Thank you, sir.

9              THE COURT:  Mr. Picone?

10             THE DEFENDANT:  Yes, Your Honor.

11             I don't consider myself a good speaker or

12    writer so I just wrote what came to me.  So I apologize

13    in advance if there are any grammatical errors or I say

14    something wrong.

15             Since this all started I have done what

16    everyone has asked me, from my lawyers to probation

17    officers.  I've also kept quiet.  I have read what

18    others said about me in some media reports.  I read

19    things people said about me that have no idea who I am.

20    I have read and heard all these horrible things and I

21    still kept silent.  I've told this is where I can

22    finally say what I want to say.

23             I fought this charge for two years.  I fought

24    because I truly could not believe I would do anything

25    like this.  I have lived my life by a code since I can

1  remember.  I love being American, loved serving my

2  country and brothers and sisters I was stationed with.

3  I was never more proud than that time.  Since I was

4  young, though, I knew I had a sentence.

5          I'm sorry.

6          It was something that I tried as hard as I

7  could to keep private.  Those closest to me knew about

8  it and I didn't want to let it define me, no matter how

9  crippling it was.

10          Back when I was a teenager no one really knew

11  what it was, no one really knew what panic disorder was

12  and everyone chalked it up to being a depressed

13  teenager.  Still, I was and still am a very private

14  person, very private.  The fact that I am here doing

15  this is extremely hard for me.

16          I did not want anyone to know about my

17  illness, especially my parents.  I wanted to ignore it.

18  I wanted to do things on my own and not be reliant on

19  anyone and anything, maybe even to a fault.

20          I could not finish high school due to this

21  affliction and I could not finish my term of military

22  service either.  I went through job after job and

23  decided to start my own company as I could do it from

24  home or take time when I needed for my illness.  I was

25  determined not to let this illness define who I was.

1            Around 2007, I still don't know if it was my

2      illness or a mixture of the medication I was on, but

3      things got real bad for me.  I started not being able to

4      tell between reality and dream.  Things I thought

5      happened did not and things that I could -- things that

6      did I could only recall as a dream or not at all.  For

7      years I would wean off the medication only to suffer

8      worse withdrawals.  I would increase and decrease and

9      the effects were terrible.

10            There are so many things about those times I

11      cannot recall, not just my business but my family.  That

12      hurts more than anything.

13            It wasn't until 2013 that I was finally put on

14      a combination of meds that really helped me.  I cannot

15      thank my doctor, Dr. Barbier.  I owe him my life.

16      Though I have come to admit now that I am disabled, that

17      was a hard pill to swallow.  It literally did save my

18      life.  For the first time in years I am thinking

19      clearly.  I still suffer from my PD, but at least I'm

20      able to live with a clear mind.

21            So here I am today, involved in something I

22      would never dreamt, was my worst nightmare.  This is the

23      first thing I think of when I open my eyes in the

24      morning and the last thing I think of when I close them.

25            I know people want to know about remorse and

1    whether I'm sorry.  Of course I'm sorry.  Of course I'm

2    remorseful.  Anyone who knows me knows this is not me.

3         The fact that something that came through my

4    hands could have caused damage to equipment, or worse,

5    is something I could not live with if it happened.  If

6    that happened, I would not be able to live.  There are

7    no words to express the horror that I feel.  But I was a

8    sick man.  The only reason I took a plea on this is

9    because I cannot 100 percent say during those dark times

10   that I didn't let something get through and did

11   something I cannot remember.  In my right frame of mind,

12   on the right medications, never in a million years would

13   I have done anything like this.  It is not who I am.  I

14   would sooner take my own life than do anything.  I am a

15   patriot.  I would and I still would die for my country.

16        For these last three years I've watched my

17   family absolutely destroyed.  I have seen my wife, my

18   daughter and my son all lose everything, and I just

19   don't mean material things.  I have seen them lose their

20   privacy, their sanctity, their sense of safety, and more

21   than anything, hope.  To see my wife almost give up on

22   life is something I would not wish on my worsen enemy.

23   To see my daughter diagnosed with the same illness I

24   have, and now worse due to her PTSD when they raided our

25   home, is something that kills me inside.  I now home

1   school her because she has a hard time leaving the home

2   like me.  And to see my son become a hoarder of

3   everything from paper wrappers to old clothing because

4   he lost so much wretches my soul.

5          To think that now I am considered a convicted

6   felon, that is something that maybe others may not care

7   much about or think about, but for me it's a scar and a

8   wound that will never heal.

9          Everyone wanted me to speak.  All I know is

10  how to be direct.  My family has been absolutely

11  destroyed.  We will never be the same, that I know.  We

12  are desperately trying to rebuild.  I am doing all I can

13  to bring a home back to them.  I am so tired of the

14  tears and the lack of hope.  I'm so afraid of what the

15  future brings.

16         Your Honor, I don't really know about law and

17  how it works.  All that I know is what I've been through

18  and I just simply ask for mercy.  We need to rebuild our

19  family and mercy is all I ask for.

20         Thank you, Your Honor.

21         THE COURT:  Thank you, sir.

22         Anyone else, Mr. Denner?

23         MR. DENNER:  No, sir.

24         THE COURT:  Mr. Williams.

25         MR. WILLIAMS:  Thank you, Your Honor.

1          At the outset I'd say that at least at some

2     level you're not going to see a lot of separation

3     between the government's view of the Court's choice

4     today and the defense's view of it.  We're not out and

5     we never have been out to demonize the defendant.  What

6     the government wants to emphasize is the seriousness of

7     the crime.  That's why we're here today.

8          The government saw the defendant allocute and

9     he went well beyond the stipulated set of facts.  The

10    government accepts at face value what appeared to be

11    really genuine contrition, real feeling that the

12    defendant has that he did something wrong and he

13    recognizes that now.

14         The government is not suggesting at all that

15    the defendant wanted anyone to get hurt, wanted any

16    critical mission system to fail, but Your Honor, that's

17    the nature of this business.  What the defendant did was

18    gamble.  He gambled that it would be okay.  He bought

19    parts from China.  He didn't know who made them.  He

20    didn't know where they came from.  He didn't know how

21    they had been manufactured.  He brought them over here

22    and he sold them over and over and over again over the

23    course of five years, to the tune of over $4 million,

24    gambling, gambling that it would be okay; that they

25    would probably work; that no one would be hurt.

1           But of course, that's not a gamble that we as

2    a country or society can afford to take.  That's one of

3    the reasons that Congress passed the amendment to the

4    Trademark Counterfeiting Act in 2011 specifically adding

5    a provision for counterfeit military parts which doubled

6    the statutory maximum -- even though that doesn't come

7    into play today because of the very reasonable

8    Guidelines range that the government agreed to -- which

9    more than doubled the fine.  Congress considered this an

10   extremely serious problem.

11          Sort of adding to this is that the

12   defendant -- and the government hasn't challenged that

13   he's facing severe psychiatric problems, that he's been

14   a long-term user of medication, but there's good

15   evidence that he knew exactly what he was doing and,

16   frankly, the consequences of it, the fact that it was

17   criminal, in that in addition to selling these parts, he

18   went to efforts to conceal what he was doing.  He

19   prepared false testing reports.  While every case is

20   different, at least in this prosecutor's experience,

21   that's sort of a plus factor when you're considering the

22   culpability of a defendant, somebody who not only

23   commits the crime, but knowingly and very carefully goes

24   to efforts to conceal the crime that he's committing.

25          Now, I just want to finish by talking I think

1      about the general and very important issue raised by

2      counsel.  One of the things that the Court must consider

3      is whether whatever sentence it imposes is consistent,

4      at least in a general fashion, with other sentences

5      around the country.  Now we're at somewhat of a handicap

6      here because there just haven't been that many of these

7      cases.  The government apologizes for not being a little

8      better prepared to address this argument.  It wasn't

9      something, as Your Honor knows, that counsel raised in

10     his memo.  I'm not faulting him for that.  He says he

11     became aware of the Krantz case when he walked into the

12     courthouse today.  But I've been consulting with my

13     colleague and some of the agents that we work with to

14     find out what we can.  And as I think counsel alluded

15     to, the Krantz case hasn't even proceeded to sentencing

16     yet so this is all speculation, but just taking at face

17     value everything that counsel says is true, it is, of

18     course, a different case.

19             As Your Honor knows, the calculation of

20     Guidelines ranges is a mathematical exercise.  It's

21     based on a value which either is determined based on

22     evidence at a hearing or to which the parties agree.  So

23     the Guidelines range in this case is based on the value

24     that the parties agreed to and stipulated to.  That's

25     where it comes from.  It's not some Draconian effort by

1    the government to come up with a higher Guidelines range

2    than the one in Krantz.

3              Also, this prosecutor is informed that in

4    Krantz the conduct that was charged was basically a

5    discrete sale, a sale that resulted in the installation

6    he ICs on a particular model of Army helicopter.  Here,

7    by contrast, while the government acknowledges that the

8    actual charge to which he pled guilty covers only a

9    three-month period, I think the parties have both

10   pointed out to the Court that he did stipulate to a

11   course of conduct spanning from 2011 to 2012.  So this

12   is based on his entire operation.

13             While I'm not necessarily disputing counsel's

14   characterization of Krantz's criminal operation, I'm not

15   sure that he is in a position to know that, to know that

16   the entire operation was criminal.

17             Here, by contrast, the defendant himself

18   stipulated that $216,000 worth of counterfeit ICs --

19   that constituted 70 percent of his entire inventory --

20   was seized from his home and business back in 2012 when

21   federal law enforcement agents executed a search

22   warrant.  70 percent.  That doesn't necessarily mean

23   70 percent of all of his sales were counterfeit ICs, but

24   it's at least some evidence that a substantial portion

25   of them, probably a majority of them were counterfeit

1    ICs.

2             In addition, as I said, the government is at

3    somewhat of a handicap because there have been fairly

4    few of these prosecutions so far, but we did want to

5    make Your Honor aware of at least three other cases with

6    either similar charges or similar facts, and we can

7    gather more information on these, as of course can Your

8    Honor.  If it is completed today, this will be just the

9    second conviction ever under this new provision, the

10   counterfeit military parts.  The only other conviction

11   was a case called U.S. against Yang in the district of

12   Maryland.  That was in 2014.  The sentence there was

13   21 months.

14            In two other cases which preceded the

15   enactment of that statute but also concerned counterfeit

16   military goods, the sentences were as follows:  U.S.

17   against McCloskey in the district of D.C. in 2011

18   resulted in a sentence of 38 months.  That was also a

19   case involving the sale of counterfeit integrated

20   circuits.  And in addition, Ms. McCloskey -- and this is

21   public knowledge so the government can put it on the

22   record here -- was cooperating.  So that was after a 5K,

23   a 38-month sentence.

24            In addition, there was a case called U.S.

25   against Felahy, also in the district of D.C.  This was

1    2012 involving a company called MVP Micro.  While I

2    can't say for sure that it involved solely integrating

3    circuits, it also involved electronic components.  In

4    that case the defendant was sentenced to 20 months.

5            At the end of day Your Honor has to consider

6    this case on its own merits, just as you must every case

7    which comes before you, but to the extent that the Court

8    does take into account other sentences imposed around

9    the country, the government would suggest that the

10   example raised by counsel is not the only one out there;

11   that the Court should consider these other cases as well

12   to the extent that that makes a difference in the

13   sentence.

14           Finally, counsel suggested that it wasn't

15   necessary for the admiral to come up here.  That's

16   something which I think we can agree to disagree on.

17   The one thing I would say, just for all the taxpayers

18   here in the courtroom, is that the admiral, both this

19   time and the other time that he came up to the district

20   of Connecticut but sentencing had to be adjourned at the

21   last minute because of counsel's unavailability, was

22   very careful to make sure that he arranged work that he

23   could be doing in the district of Connecticut while he

24   was up here, because as Your Honor well knows, there is

25   an awful lot of work up here relating to the United

1    States Navy nuclear submarines.  So while he did come up

2    to testify here, it's not as if the only thing he was

3    doing in the district of Connecticut was testifying at

4    this hearing.

5           Anyway, the government appreciates the Court's

6    patience and attention and urges the Court to impose a

7    Guidelines sentence, guidelines which themselves were

8    the result of plea negotiations between the parties and

9    which already represent a significant break for the

10   defendant.

11          Thank you.

12          THE COURT:  I do have a couple of questions

13   for counsel.

14          One of the areas where counsel disagree is on

15   the grounds urged for a downward departure in terms of

16   substantially diminished -- reduced mental capacity, and

17   that that reduced mental capacity contributing

18   substantially to the commission of the offense.  The

19   government's memorandum, as I'm sure you know,

20   Mr. Denner, has a recitation of certain facts that are

21   pointed to as evidence that the defendant understood the

22   wrongfulness of his behavior, and that shows that the

23   defendant really was not suffering from a significantly

24   reduced diminished capacity.  And then, in addition,

25   points to the absence of persuasive evidence that it was

1    a factor that significantly -- that contributed

2    substantially to the commission of the offense.

3         I have all these medical records here and I

4    have general references to medication, but I have to

5    say, it didn't leap out at me, from all of these reams

6    of medical records, where the defendant had a

7    significantly reduced mental capacity.  I saw from

8    looking through them that the defendant has a

9    significant problem, but I didn't see in these records

10   something that referred to it as a significantly reduced

11   mental capacity.

12        In addition, I read with interest all the

13   letters that were submitted and the impression I got

14   from almost all the letters was that we have a

15   high-functioning individual.  I'm struck that the

16   letters from family members, other than the defendant

17   and his wife are the ones that come to mind, don't

18   really seem to point out how the defendant's been

19   struggling to operate in a way other than walking around

20   in a stupor, to use an expression I think the government

21   used in its paper.

22        There are things here that sort of crystallize

23   that for me.  I guess I would invite the defense to show

24   me the best examples in the medical records.

25        MR. DENNER:  Your Honor, a couple of things.

1           With regard to the notion that he appreciated

2      the wrongfulness of what he did, I would respectfully

3      suggest that if I didn't believe that he -- that would

4      have been an insanity defense; if he could not

5      appreciate the wrongfulness of his actions and/or the

6      unlawfulness of his actions, under the federal system I

7      would have endeavored to bring an insanity defense, I

8      think under either 5K -- under the diminished capacity

9      guideline or the policy statement, which is 5H1.3, under

10     the first what you really need is a mental condition

11     that substantially contributes to the offense conduct,

12     substantially diminishes his capacity to understand and

13     contributes to the offense conduct.  And I think when

14     you read the history starting in his medical records

15     10 years ago, when you read what he's saying to the

16     doctors and what they're saying to him and the

17     medications they're putting him on --

18           THE COURT:  Let me press you on that a bit.

19     Number one, in terms of understanding wrongfulness, I

20     think the point there isn't there's a question as to

21     whether -- the point there isn't that he understood the

22     wrongfulness.  The point is that he did things in

23     response to apparently understanding the wrongfulness

24     which required him to make calculations.  He had to

25     think about what he was doing and how to cover it up.

1    And how is it that someone who is totally at a loss in

2    terms of knowing what they're doing happens to engage in

3    conduct which helps to cover up his offense.  We had the

4    example of changing the name of the company that was

5    being used --

6              MR. DENNER:  I understand --

7              THE COURT:  Let me finish my question.

8              MR. DENNER:  Certainly, Your Honor.

9              THE COURT:  Changing the name of the company

10   that was being used.  And there was something else that

11   was mentioned here.  Let me just find that.  It was the

12   test reports, I think.

13        What concerns me as I'm trying to test the

14   validity of this defense theory is that the only time

15   that I'm being shown consequences, or negative

16   consequences of the defendant's condition, is when it's

17   something that constitutes offense conduct.  The rest of

18   the time, based on what I'm seeing, he seems to be high

19   functioning.  That's a disconnect for me.

20        Other than what's in the defendant's letter

21   and in the defendant's wife's letter, which you can

22   understand are things I have to critically examine.

23              MR. DENNER:  Of course, Your Honor.

24              THE COURT:  We have the references to all the

25   medications, I was in a fog, I didn't know what I was

1    doing.  The letters from the other relatives don't touch

2    on that at all, which I find not helpful to the

3    defendant's argument.

4         MR. DENNER:  I can understand your position,

5    Your Honor.  I would respectfully suggest that if I had

6    asked the parents to write letters like that, then they

7    would.  We were presenting this to the Court just the

8    way it is.  What you get is what you see.  He has told

9    you, and his wife, she told me -- perhaps she didn't say

10   in the letter, but he told you in his own letter and I

11   will tell you again that he was mortified at how he was.

12   He tried to keep it as private as he could from as many

13   people as he could.  He didn't want to disappoint his

14   parents.  He was disappointing enough already.

15        I think what you have here, Your Honor, I've

16   read every medical record I could get.  I've read what

17   they said about him, what he was saying to them at the

18   time about the anxiety that he had that was disabling.

19   It's not just at the offense conduct time that this was

20   happening.  These medical records span the time period

21   starting back in 2008 or 9.  He dropped out of high

22   school because he couldn't hack it anymore because of

23   the condition he had.  He went from job to job --

24        THE COURT:  I'm not questioning that he had a

25   condition.  I think everybody is in agreement that he

1   had a condition.  The question is whether he has the

2   condition that leads to him being in such a fog that he

3   doesn't know what he's doing when he's committing the

4   offense.

5           MR. DENNER:  I don't think that's required.

6           THE COURT:  Well, we're talking about a

7   condition that --

8           MR. DENNER:  That substantially contributes to

9   the offense conduct.

10          THE COURT:  Yes.

11          MR. DENNER:  That's not the only reason for --

12          THE COURT:  Well, I'm taking his words as to

13   how it contributed to his committing the offense.  I

14   don't remember what I was doing.  I didn't know what I

15   was doing.

16          MR. DENNER:  Certainly times he didn't recall.

17   Let's assume, let's assume that he's telling the truth;

18   that for whatever psychiatric issues are, whatever

19   denial there is and so forth and so on --

20          THE COURT:  Yes.

21          MR. DENNER:  -- that he was so anxious,

22   because that's what he's telling you, he was so anxious

23   that he literally had everything to do to stay alive.

24   Rather than bring some expert witness in who would read

25   through the records and basically write to a reasonable

1    degree of medical certainty that this is what happened,

2    I chose to show you the actual medical records

3    themselves, and to some extent hear from him, because I

4    think the standard here is not one -- these are the

5    treating people who give you kind of a realtime reality

6    show of what his life was like.

7              THE COURT:  So walk me through the records and

8    show me where in the records we have statements and

9    conclusions by the doctors, or statements by the

10   defendant that show that he was --

11             MR. DENNER:  Your Honor, I don't have all the

12   medical records in front of me here now.  I'm sure I

13   have a bunch in the car.

14             THE COURT:  Well, they're all attached to the

15   sentencing memorandum.

16             MR. DENNER:  I think some are.

17             THE COURT:  I read through them.  I can tell

18   you what -- I flagged some things.  I have the period --

19   let me just take a second and flip through while you're

20   flipping through yours.  They're voluminous, but that

21   was really the thing about them that struck me the most.

22   I was looking at them -- and I think I had the probation

23   officers look through them too.  I'll ask her to flip

24   through and see if she can find anything and come see me

25   at the sidebar if she finds anything that she thinks is

1    helpful.

2            MR. DENNER:  One thing, Your Honor, the

3    medications he's taking are antianxiety, antidepressive,

4    and antipsychotic medications.  Your Honor can infer

5    from that, and the diagnostic categories they come up

6    with, general anxiety disorder, the extended depression

7    and then ultimately, after the service, the post

8    traumatic stress disorder.  That, combined -- and I'll

9    go through this page by page, but that combined with

10   every time he goes to the doctor -- well, not every time

11   but often when he's at the doctor they're prescribing

12   him medications consistent with what he's explaining to

13   them about having incredible anxiety, he's basically

14   unable to function.

15           If you combine the diagnoses, the medication

16   he's taking with his statements to you about the life

17   he's led, Your Honor, and that you get from his wife

18   too, he's out in ninth grade in school and joins the

19   military.  All of this is reflected in different parts

20   of the record.  He has a complete meltdown and is

21   psychiatrically hospitalized for months in probably 1996

22   when they send him out of the military for medical

23   reasons.  Then, going forward, it's job to job.  He

24   literally has to try to find something to do to work

25   from home.  During that time period he has periods of

1    which he can do nothing at all, which both he and his

2    wife tell you.

3            And again, with all respect, I would think

4    that the kind of medications he was taking over that

5    time period, the description he's giving of his

6    condition to the different doctors, whether it's

7    Barbier, Moverman and Neurological Associates -- I don't

8    know if you have that.  I think you have those records

9    too -- and this Happy n Healthy Dr. Haffner, there's a

10   consistent reporting that he just can't function and

11   they keep trying to adjust his medications and give him

12   a huge cocktail of medications to try to get him

13   functioning again, and as he told you, often that made

14   him worse not better.

15           The requirement for diminished capacity, to me

16   as the language indicates, it has to significantly

17   contribute to the offense.  It doesn't have to -- a lot

18   of the craziest people, with respect, I have represented

19   or troubled people over the years, we've actually done

20   insanity defenses, knew exactly what they were doing.

21   They couldn't control what they were doing.

22           THE COURT:  You're saying that -- let me give

23   you an example of one of the things that concerns me.

24   I'm just sort of flipping through and looking at some of

25   the notes here.

1          Your position is that in 2007 he couldn't

2    function, correct?

3          MR. DENNER:  Probably not for all of 2007,

4    Your Honor.  Panic attacks come.  You think you're

5    feeling okay one day and you're doing work --

6          THE COURT:  So it's only on the days when he

7    was committing the offense conduct that he couldn't

8    function?

9          MR. DENNER:  Of course not.

10         THE COURT:  That's the way it's coming across

11   to me.

12         MR. DENNER:  There were many times he wasn't

13   working at all, when he couldn't function.

14         THE COURT:  Let me read you one of the things

15   in the medical records that concerns me.  On ECF

16   Document 82-1, page 30 of 55.

17         MR. DENNER:  I don't think I have the same

18   numbering system you have, Your Honor.

19         THE COURT:  It's September 28, 2007, page 2.

20         MR. DENNER:  Which doctor would this be?

21         THE COURT:  Dr. Moverman.

22         MR. DENNER:  What was the date, Your Honor?

23         THE COURT:  September 28, 2007.  It says his

24   only stress involves his workload, but he feels that

25   he's dealing with this reasonably well.  He does

1    acknowledge having difficulty shutting his mind down.

2    Current functioning:  Mr. Picone presents this mental

3    status examination as alert and oriented in all spheres.

4            MR. DENNER:  I put that in, Your Honor,

5    because I wanted you to have all the medical records.

6    There were times where he was that way.

7            THE COURT:  Well, I've asked you to point --

8    I'm looking for something in the medical records that

9    supports the defendant's contention and I'm having

10   trouble finding it.

11           MR. DENNER:  May I sit, Your Honor?

12           THE COURT:  Please do.

13           MR. DENNER:  Starting with Happy n Healthy

14   Family Medicine -- well, this is 2012.  This is dated

15   June 26, 2012.  Take a look, Your Honor, at all the

16   medications he's taking.  That's on the first page of

17   that, this formal health record, and take a look at the

18   medications he was taking.

19           On the next page as well it talks about the

20   effects of the Clonopin, the Celexa, all of which are

21   very serious psychoactive medications.

22           Then, patient comes in today --

23           THE COURT:  Which document are you on?

24           MR. DENNER:  This is the third page of the

25   June 26, 2012 Dr. Haffner, Happy n Healthy Family

1    Medicine report.  I guess this is after.  This one is

2    after the raid by the government.

3              THE COURT:  This is after the --

4              MR. DENNER:  Let me move back a little bit.

5              MR. WILLIAMS:  For the record, Your Honor, I

6    think that was page 4 of 55 in Attachment A to the

7    defendant's memorandum.

8              THE COURT:  4 of 55?

9              MR. WILLIAMS:  Right.  That's where the

10   narrative was.

11             MR. DENNER:  And Your Honor, I have a document

12   here from Laurie Rogers.  It's dated Tuesday,

13   February 14, 2012, which would have been before.

14             THE COURT:  Let me see if we can find that.

15             MR. DENNER:  I don't have the same numbering

16   system you have.

17             MR. WILLIAMS:  I believe that starts on page 8

18   of 55 in Attachment A to the defendant's sentencing

19   memorandum.  Exhibit 1.  I'm sorry.  Exhibit 1, page 8

20   of 55.

21             THE COURT:  I have that.

22             MR. DENNER:  Your Honor, 38 year old male

23   presents to the office to follow up on a previous office

24   visit when he was seen stating that he wants to get off

25   Effexor, no longer thinks it's working.  He's gone from

1    one to two panic attacks per year --

2         THE COURT:  Actually, so we don't have the

3    court reporter, let me just read that paragraph.  I have

4    it.  It begins 38 year old male.

5              (Pause.)

6         THE COURT:  So the introduction to this

7    language shows that he's gone from one to two panic

8    attacks a year to one to two per month.

9         MR. DENNER:  Yes, Your Honor.  And when he has

10   these panic attacks they sometimes last for days at a

11   time and then he's in this serious depressive state

12   thereafter.

13        I'm happy to put him on the stand.

14        THE COURT:  The next sentence says they are

15   debilitating and they start abruptly and they go on for

16   several minutes.

17        MR. DENNER:  Perhaps at that point -- there

18   are also ones that go on for several days and there are

19   ones that he's then in a deep depressive --

20        THE COURT:  What I'll do, Mr. Denner, because

21   this is isn't a very efficient way to do this, I'll let

22   you go through and highlight for me, with citations to

23   the pages in the record, which part of these medical

24   records the defendant is relying on for his downward

25   departure argument.  I'll let you do that in writing and

1    I'll let the government respond.

2              MR. DENNER:  Fine, Your Honor.  There are some

3    medical records that I didn't bring with me today, not

4    anticipating so if we could have some period of time

5    that would be great.

6              THE COURT:  Okay.  I do want to make sure he's

7    fully heard on his departure argument, but at this point

8    I really felt I was getting a rather conclusory and

9    self-serving recitation from the defendant.

10             Number 1, I wasn't particularly persuaded,

11   based on what I read, when I looked at the way in which

12   the defendant was able to function in other arenas that

13   he had a situation that I could, in good conscience,

14   find constituted a significantly reduced mental

15   capacity.

16             And Number 2, someone can have a significantly

17   reduced mental capacity and it can be one that does not

18   relate at all to the commission of the offense or does

19   not significantly or substantially relate to the

20   commission of the offense.

21             So there are two steps there and I don't see

22   the defendant as having satisfied his burden at this

23   time.

24             MR. DENNER:  I appreciate the opportunity to

25   go through the medical records, Your Honor.

1           I am basically away on cases and then a short

2    trip that I can't undo.  Do you think we could have

3    until Monday -- Tuesday, September 1st to put this

4    together?

5           THE COURT:  Sure.  Why don't you get yours in

6    and then we'll have a call with counsel for the

7    government and see when the government wants to respond

8    and then we'll schedule the continuance.

9           MR. DENNER:  Thank you.

10          THE COURT:  We'll recess then.

11                (Whereupon, a recess followed.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

88

1                    C E R T I F I C A T E

2

3              United States vs. Peter Picone

4                     3:13CR00128(AWT)

5

6

7         I, Corinna F. Thompson, RPR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages, pages 1 – 87, are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter on August 14, 2015, to the best of

13   my skill and ability.

14

15

16

17

                    /s/_____

18

                     CORINNA F. THOMPSON, RPR

19                    Official Court Reporter
                     450 Main Street, Room #225

20                   Hartford, Connecticut 06103
                         (860) 547-0580

21

22

23

24

25